**IN RE: PREMIER GOLF PROPERTIES, LP,**
**Debtor.**

**BANKRUPTCY NO. 15–01068–CL11**

United States Bankruptcy Court, S.D. California.

Date of Hearing: 04/27/2016, Time of Hearing: 3:00 p.m.

Signed May 27, 2016

Darvy Mack Cohan, La Jolla, CA, Jack Fitzmaurice, Fitzmaurice & Demergian, Chula Vista, CA, for Debtor.

Garrick A. Hollander, Peter W. Lianides, Winthrop Couchot, P.C., Newport Beach, CA, Richard M. Kipperman, La Mesa, CA, for Trustee.

Haeji Hong, Office of the U.S. Trustee, San Diego, CA, for United States Trustee.

## ORDER OVERRULING DEBTOR'S OBJECTION TO CLAIM NO. 10 OF COTTONWOOD CAJON ES, LLC

Christopher B. Latham, Judge, United States Bankruptcy Court

IT IS HEREBY ORDERED as set forth on the continuation page(s) attached, numbered two (2) through forty-nine (49).

The court has considered Premier Golf Properties, LP, Edgewood Distributors & Management, Inc., R.H. Rodriguez, Inc., and Premier Golf Property Management, Inc.'s (collectively, "Debtor") combined motion for reconsideration and supplemental objections to Cottonwood Cajon ES, LLC's ("Claimant") proof of claim number 10–1 (the "Claim"), Claimant's opposition, Debtor's reply, the respective supporting evidence, its own docket, and the parties' oral argument at the hearing on this matter. For the following reasons, the court: (1) **overrules** without prejudice Debtor's objection that the Claim is overstated; and (2) **overrules** the remainder of the claim objection.

### Background

*Factual Background and Procedural History*

The parties are familiar with the material facts. Debtor owns and operates a golf course and related concerns in Rancho San Diego. On December 21, 2007, Debtor gave Far East National Bank ("FENB") a $11,500,000 promissory note (ECF No. 193–1, p. 1). On December 24, 2007, the parties entered into a loan agreement evidencing the promissory note and underlying obligation (ECF No. 193–1, pp. 21–45) (the "Loan Agreement"). Henry Gamboa ("Mr. Gamboa") personally guaranteed the loan, promissory note, and the Loan Agreement. A first position trust deed secures Debtor's obligations under the Loan Agreement and promissory note. On December 24, 2007, as additional security for the loan, the parties executed a security agreement in FENB's favor (ECF No. 193–1, pp. 10–17) (the "Security Agreement"). Under the Security Agreement's terms, all of Debtor's present and future obligations owed to FENB are secured by all of its present and after-acquired personal property. In relevant part, the Loan Agreement provides:

- Section 1.3(a): Subject to Section 1.3(b), Borrower shall pay interest on the unpaid principal amount of the Loan from the Closing Date until such principal amount is paid in full, at a rate per annum equal to the Prime Rate plus one-half of one percent (0.50%);

- Section 1.3(b): Notwithstanding Section 1.3(a), after the occurrence and during the continuance of a Default or Event of Default, Borrower shall pay interest on the outstanding Obligations at a rate per annum equal to (i) the interest rate calculated in accordance with Section 1.3(a), plus (ii) five percent (5.00%) (the "Default Rate") from the date such Default or Event of Default first occurred. Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand;

- Section 1.4: The Loan shall mature on December 26, 2009 (the "Maturity

Date") or any earlier date on which the Loan shall be required to be paid in full, whether by acceleration or otherwise;

- Section 6.16: To the extent Borrower becomes obligated on any subordinated indebtedness, Borrower shall enter into a subordination agreement in form and substance satisfactory to Lender and Borrower shall not, directly or indirectly, make any payment of principal, interest or other obligations with respect to any subordinated loan (including any redemption, purchase, prepayment, retirement, defeasance or other acquisition for value);

- Section 7.2: Borrower shall not, without Lender's prior written·consent, incur, permit or suffer to exist additional indebtedness for borrowed money or liability under guarantees or reimbursement obligations except for ... (b) subordinated loans which comply with Section 6.16 and which do not exceed One Million Five Hundred Thousand Dollars ($1,500,000) in aggregate outstanding principal amount ....;

The Loan Agreement. Section 8.1 sets forth 12 independent "events of default," including:

- (a) Failure of Borrower to pay when due (i) the principal balance of the Loan, or (ii) within five (5) days of the due date, any of the other payment or deposit obligations of Borrower to Lender, including, without limitation, any monthly payment of principal and interest, failure to make a Ratio Coverage Deposit as required by Section 6.14 or any other payment due under this Agreement; or

- (c) Breach of any covenant other than ·as set forth in subsections (a) and (b) above which is not cured within thirty

(30) days after written notice; provided, however, if such breach cannot by its nature be cured within thirty (30) days, and Borrower diligently pursues the curing thereof (and then in all events cures such failure within sixty (60) days after the original notice thereof), Borrower shall not be in default hereunder; or

- (d) A petition under any Chapter of Title 11 of the United States Code or any similar law or regulation is filed by or against Borrower, General Partner or Guarantor (and in the case of an involuntary petition in bankruptcy, such petition is not discharged within sixty (60) days of its filing); or

- (f) The occurrence of a default and the expiration of any cure period available to Borrower applicable thereto under any Loan Document; or

- (g) Borrower shall default in the payment of any indebtedness (other than the Obligations) and such default is not cured within the time, if any, specified therefor in any agreement governing the same ....;

*Id.* In addition, § 9.9 provides that the covenants and agreements contained in the loan documents shall bind both Debtor and FENB's successors and assigns. *Id.* Both parties' representatives signed the Loan Agreement. A February 1, 2010 amendment to the Loan Agreement and promissory note extended the note's maturity date to March 24, 2010.

On March 25, 2010, Debtor defaulted under the Loan Agreement by, *inter alia*, failing to repay the entire outstanding balance by the maturity date. FENB then took steps to foreclose on the property. On January 28, 2011, Debtor responded by bringing a complaint against FENB in San Diego County Superior Court (Case No. 37–2011–00065341–CU–BT–EC) seeking an injunction preventing FENB from fore-

closing (the "State Court Action"). Debtor submitted a voluntary Chapter 11 petition on May 2, 2011 (Case No. 11–07388–PB11) (the "First Bankruptcy Case"). On April 16, 2012, after receiving stay relief, FENB responded with a cross-complaint against Mr. Gamboa for breach of the guaranty.

The First Bankruptcy Case remained pending for slightly under three years before its May 26, 2014 dismissal, but Debtor never confirmed a plan. The case was dismissed by a March 18, 2014 stipulation between Debtor and FENB. But the decision to dismiss it arose from a December 23, 2013 Settlement and Release Agreement (ECF No. 193–1, pp. 2–9) (the "Settlement Agreement")—not to be confused with the July 10, 2015 Forbearance and Settlement Agreement between Debtor and Claimant that was the subject of extensive litigation in the present case (ECF No. 79–1) (the "Forbearance Agreement").

In relevant part, the Settlement Agreement states that Debtor defaulted under the Loan Agreement on March 25, 2010 by, *viz.*, failing to repay the entire outstanding balance of the loan upon maturity. In addition, the parties agreed that the total amount Debtor or Mr. Gamboa owed FENB as of November 18, 2013 was $15,379,362.49, consisting of $10,874,610.79 in principal, plus $3,082,144.61 in interest, and $1,422,607.09 in legal fees and costs (the "Total Indebtedness"). Further:

- Section 3.1: Premier shall pay the amount of Eight Million Five Hundred Thousand and 00/100 Dollars ($8,500,000.00) (the "Lump Sum Payment") to Lender on or before March 1, 2016 (the "Payment Date"). During the time between the execution date of this Agreement and the Payment Date, Premier and Mr. Gamboa agree to the following terms:
 - Section 3.1.1: Premier and/or Mr. Gamboa shall pay all amounts necessary to bring current all past due real property taxes, which are estimated to total approximately One Million Seven Hundred Thousand and 00/100 Dollars ($1,700,000.00), by no later than December 31, 2013 or within 90 days of the execution of this Agreement, whichever date is later . . . . ;
- Section 3.1.1.1: Premier and Mr. Gamboa further agree that, upon repayment of the past due taxes, they shall keep any and all new taxes assessed to the Property paid current, up until the time they make the Lump Sum Payment to Lender;
- Section 3.1.1.2: If, for any reason, the relevant taxing authorities notice a sale of the Property based upon the existing delinquent taxes, Lender may advance the amounts necessary to be paid to cancel the tax sale. Premier shall pay Lender for the amounts advanced, if any, by December 31, 2013 or within 90 days of the execution of this Agreement, whichever is later . . . .
- Section 3.1.2: Premier and/or Mr. Gamboa shall make interest-only payments beginning on January 10, 2014, and continuing on the tenth day of each month thereafter until the Payment Date, with such monthly payments calculated based upon the principal amount of Eight Million Five Hundred Thousand and 00/100 Dollars ($8,500,000.00), at a fixed interest rate of six percent (6%) per annum (the "Monthly Payments"); and
- Section 3.1.5: The amount due and owing under the Loan Documents shall remain at the amount of the Total Indebtedness until such time as Premier makes the Lump Sum

Payment. Upon payment of the Lump Sum Payment, and so long as there has been no other Event of Default under this Agreement, Lender shall waive the difference remaining between the Lump Sum Payment and the Total Indebtedness . . . .;

- Section 3.5: Except as revised by the terms and conditions set forth above, all other terms and conditions of the Note, Loan Agreement, Deed of Trust, Security Agreement and New Security Agreement shall remain in full force and effect . . . .

The Settlement Agreement at pp. 4–6. Under § 4.0, the following are "events of default":

- (a) Failure to timely perform any of the obligations and/or conditions (including, but not limited to, the payment obligations) set forth in this Agreement or the New Security Agreement;

- (b) Except as revised by this Agreement, failure to timely perform any of the obligations and/or conditions set forth in the Note, Loan Agreement, Deed of Trust or Security Agreement; and

- (c) Any representation or warranty of Premier and/or Mr. Gamboa herein or in any other document related to this Agreement is false or misleading.

The Settlement Agreement at p. 6. In addition, the parties agreed that: (1) Debtor would dismiss with prejudice both the State Court Action and the First Bankruptcy Case; (2) upon occurrence of certain conditions—including Debtor bringing property taxes current and beginning monthly payments to FENB—FENB would: (a) dismiss with prejudice its cross-complaint against Mr. Gamboa; and (b) rescind the previously recorded notice of default and election to sell under the trust

deed. *Id.* at pp. 6–7. Section 14.0 is an integration clause. Section 16.0 mandates that "[t]he Parties shall execute and deliver all documents and perform any and all further acts that may be reasonably necessary to effectuate the provisions of this Agreement." *Id.* at p. 8. And § 18.0 provides that "[i]f any provision of this Agreement as applied to any Party or to any circumstance shall be adjudged by a court to be void or unenforceable, the same shall in no way affect; (a) Any other provision of this Agreement; (b) the application of such provision in any other circumstances; and/or (c) the validity or enforceability of this Agreement as a whole." *Id.* at p. 9. Both parties' representatives signed the Settlement Agreement.

Shortly thereafter, Debtor dismissed both the State Court Action and the First Bankruptcy Case, and started making $42,500 monthly interest-only payments. And in January 2014, it began seeking subordinate financing to cover the $1,700,000 property tax liability due by March 23, 2014. On March 25, 2014, Debtor received a written conditional loan commitment from Advant Mortgage, LLC dba MVP Mortgage ("MVP") (ECF No. 155, pp. 12–19) (the "Loan Commitment"). In relevant part, the Loan Commitment offered Debtor $3,218,00—$2,500,000 of which would go toward delinquent property taxes—in exchange for a second position trust deed on Debtor's real and personal property. *Id.* at pp. 14–15. The loan's term was 24 months. *Id.* at p. 13. But MVP's funding obligation was subject to at least 20 conditions precedent that Debtor had to satisfy. *Id.* at pp. 15–18. And if Debtor failed to provide MVP certain documentation by March 28, 2014, the Loan Commitment would expire. *Id.* at p. 18.

Debtor thus needed to record a junior trust deed to support the funding for the property tax payment. Under §§ 6.16 and

7.2 of the Loan Agreement, it apparently required FENB's consent to record a junior lien. Instead of consenting, however, FENB sent Debtor a March 28, 2014 notice of default for failure to meet the tax payment deadline (ECF No. 193–1, pp. 47–49) (the "First Default Letter"). The First Default Letter requested that the delinquent property taxes be paid by April 4, 2014; otherwise, FENB would proceed with its rights and remedies under the Loan Agreement, the Settlement Agreement, and other relevant loan documents. *Id.* at p. 48. MVP eventually withdrew the funding.

After that, Debtor continued making monthly payments. On August 14, 2014, FENB sent Debtor a second default letter (ECF No. 193–1, pp. 51–53) (the "Second Default Letter"). The Second Default Letter again noted Debtor's default under the Settlement Agreement for its failure to pay the delinquent property taxes. This time, however, FENB: (1) rejected Debtor's proposal to partially pay the taxes through subordinate financing; (2) returned Debtor's August 12, 2014 $44,000 monthly payment; and (3) stated its intention to proceed with its rights and remedies under the Settlement Agreement and other loan documents. *Id.* at p. 52. Because FENB then sought foreclosure, Debtor reentered bankruptcy with the present voluntary Chapter 11 petition on February 24, 2015 (Case No. 15–01068–CL11) (ECF No. 1) (the "Present Case").

On May 14, 2015, Claimant filed the subject secured Claim for $16,428,631.60, which includes a $5,554,020.81 arrearage. On October 12, 2015, Debtor filed a joint plan of reorganization (ECF No. 119) (the "Plan"). The Plan treats the Claim as unimpaired in Class 2. It proposes to pay Claimant, on the effective date, as follows:

> All arrearages under the Settlement Agreement consisting of monthly interest payments in the amount of $42,500 that came due before the Petition Date. Such payment, plus payment of the Class 1 Claim in accordance with this Plan, plus payment of any allowable damages (as determined by the Bankruptcy Court) under Bankruptcy Code section 1124(2)(C) & (2)(D) shall constitute a complete cure and reinstatement of all obligations under the Settlement Agreement pursuant to Bankruptcy Code sections 1123(g) and 1124(2) such that notwithstanding any other provision of this Plan, and notwithstanding applicable non-bankruptcy law, any and all late fees or charges, default fees/interest or charges, and/or penalties, penalty interest, fees, or other charges of any kind resulting from any failure to timely make payments(s) otherwise due the holder of the Class 2 Claim shall be disallowed in its entirety (or their entireties). Except as provided for in this Plan (including the cure provisions of this Plan), all provisions of the Settlement Agreement shall remain in effect, including without limitation the provisions fixing the principal amount of the Class 2 Claim at $8.5 million and establishing the due date for payment of such principal amount as March 1, 2016. The Allowed Amount of the Class 2 Secured Claim may be subject to setoff (under either bankruptcy law or under applicable non-bankruptcy law) on account of the Debtor's claims against Far East National Bank and/or against the holder of the Class 2 Claim . . . .

The Plan at pp. 9–10.

On December 11, 2015, Debtor filed its first claim objection (ECF Nos. 153 & 154) (the "First Claim Objection"). The First Claim Objection involved whether Debtor, as a matter of law, could cure its defaults under the Settlement Agreement using §§ 1123(a)(5)(G) and 1124(2) and *Great W.*

*Bank & Trust v. Entz–White Lumber & Supply, Inc. (In re Entz–White Lumber & Supply, Inc.)*, 850 F.2d 1338 (9th Cir. 1988) ("*Entz–White*"). Put differently, Debtor sought to cure its default and return the Settlement Agreement to its pre-default status, *viz.*, that it could take advantage of the $8.5 million discounted payoff that the agreement provided for—$6,879,362.59 less than the Total Indebtedness. Debtor's proposed cure consisted of: (1) payment of all real estate taxes due and owing; (2) payment to Claimant of the missed interest-only payments from August 2014 until the $8.5 million balloon payment is made; and (3) on the later of March 1, 2016 or the plan's effective date, the $8.5 million balloon payment. In addition, Debtor requested a $120,000 credit for payments made to Claimant in 2015 in contemplation of the Forbearance Agreement.

Alternatively, Debtor argued that FENB breached the Settlement Agreement first by failing to timely consent to the junior encumbrance, which would have allowed Debtor to pay the property taxes by the March 23, 2014 deadline. As a result, Debtor contended that, even if it was not legally entitled to cure any alleged default under the Settlement Agreement, it should nonetheless be excused from the deadline to pay property taxes.

Finally, Debtor asserted that Claimant failed to adequately explain the $1,049,269.11 difference between the Total Indebtedness and the $16,428,631.60 in the Claim. Absent additional documentation, Debtor objected to any interest, appraisal fees, foreclosure fees, attorneys' fees, witness fees, force place insurance, and other fees included in the $1,049,269.11. Claimant opposed the First Claim Objection.

The court heard argument on the First Claim Objection at the January 29, 2016 hearing, and took the matter under submission. Before doing that, however, the parties expressed interest in additional motion practice if the objection was overruled (ECF No. 175).

### *The Court's February 19, 2016 Interim Order on the First Claim Objection*

On February 19, 2016, the court issued an interim order on the First Claim Objection: (1) overruling the objection so far as it asserted that Debtor could cure its alleged default under §§ 1123(a)(5)(G) and 1124(2) and *Entz–White*; (2) overruling without prejudice Debtor's objection that the Claim lacks sufficient documentation or substantiation; (3) at the parties' behest, holding in abeyance the issue of FENB's alleged breach and the consequences that flowed from it; and (4) denying Claimant's request to file a sur-reply (ECF No. 183) (the "Order"). Because Debtor seeks partial reconsideration or successive summary adjudication of the Order—and its findings are relevant to the present dispute—a fuller explanation is appropriate.

The First Claim Objection involved two discrete issues: (1) whether Debtor could, as a matter of law, cure its alleged defaults under the Settlement Agreement using §§ 1123(a)(5)(G) and 1124(2) and *Entz–White*; and (2) whether the Claim should be disallowed for Claimant's failure to adequately explain the difference between the Claim amount and the Total Indebtedness. Debtor discussed a third issue in great detail, namely whether FENB's alleged breach in connection with the proposed MVP funding excused its obligations under the Settlement Agreement. The court found those arguments outside the First Claim Objection's scope, and held them in abeyance pending further motion practice.

That being said, the court first examined the Settlement Agreement, which contains a merger clause, and found its language plain and unambiguous. And for that rea-

son, it limited its analysis to the agreement's four corners—it did not consider extrinsic evidence. In doing so, the court declined to adopt Debtor's contractual interpretation. As Claimant correctly asserted, there were two conditions precedent to Debtor's receiving the $6.8 million debt reduction: (1) the $8.5 million lump sum payment by March 1, 2016; and (2) there could not be any other event of default under the Settlement Agreement. Both had to exist or occur before FENB's duty to perform, *i.e.*, before FENB was required to waive the difference between the lump sum payment and the Total Indebtedness. Debtor thus had a contingent right to a future debt reduction, subject to satisfying certain conditions precedent.

Debtor's own evidence showed that it did not pay the delinquent property taxes by the March 23, 2014 deadline. This worked a default under § 4.0 of the Settlement Agreement. The Court thus found that Debtor breached the Settlement Agreement by failing to pay the property taxes. And this breach had two consequences: (1) it put Debtor in default under § 4.0; and (2) it prevented a condition precedent from being satisfied. Because there was an event of default, Claimant's duty to waive the balance in excess of the $8.5 million lump sum payment was never triggered. And Debtor's right to the debt reduction never arose, for failure to satisfy the condition precedent.

On the cure issue, the court disagreed that Debtor could use §§ 1123(a)(5)(G) and 1124(2) and *Entz–White* to reinstate the Settlement Agreement and cure all defaults thereunder. It specifically found *Entz–White*'s broad interpretation of §§ 1123(a)(5)(G) and 1124(2) inapplicable to the present dispute. This case involves neither an acceleration clause nor Debtor's attempt to nullify a default interest rate, and the Settlement Agreement does not enumerate possible remedies or conse-

quences of default. In addition, this case does not involve a debtor who merely defaulted on a monetary obligation to a creditor. Indeed, it is Debtor's attempt to cure a defaulted obligation to a third party under an agreement. It is not about money; rather, the operative issue is Debtor's failed attempt to meet a contingency that would have extinguished a potential liability.

Further, even if *Entz–White* could be used to cure Debtor's default, the court found it both logically and temporally impossible to reinstate the Settlement Agreement because Debtor could not go back in time and pay the property taxes by the March 23, 2014 deadline. Indeed, the condition precedent can never be satisfied, and *Entz–White* does not change that. Put differently, *Entz–White* does not say that a debtor can unwind the clock to meet a condition precedent. Nor does it involve a debtor's attempt to excuse the consequences of a condition's never occurring. Debtor cited no authorities allowing it to use §§ 1123(a)(5)(G) and 1124(2) to revive a conditional right that lapsed prepetition as a result of a failure to timely satisfy a condition precedent, or to excuse the nonoccurrence of such a condition. The court deemed this to be an incurable historic fact.

The court then overruled without prejudice Debtor's argument regarding the Claim's lack of sufficient documentation or substantiation because it failed to dispute its liability or the Claim's amount.

That being said, the First Claim Objection was overruled without prejudice to Debtor bringing further objections based on the Claim's documentation or other issues not raised in the objection.

*Debtor's Supplemental Objections to the Claim and Motion to Reconsider the Order*

The present dispute marks the second round of claim objections. Debtor now as-

serts that its latest objections are equivalent to a successive summary judgment motion after a first one was denied. Alternatively, it seeks reconsideration of the Order under Federal Rule of Civil Procedure ("FRCP") 54(b), incorporated by Federal Rule of Bankruptcy Procedure ("FRBP") 9014 and 7054, because a court has inherent authority to revisit or revise interlocutory rulings for any reason. It seeks partial disallowance of the Claim on several grounds.

Debtor first contends that § 3.1.5 of the Settlement Agreement—which mandates payment of the Total Indebtedness should Debtor not make the lump sum payment or commit any other event of default—is an unenforceable penalty or forfeiture under California Civil Code ("CC") §§ 3275 and 1671(b), and various state court cases. Put differently, if this portion of the Settlement Agreement is enforceable, Debtor would lose: (1) the $6.8 million discount; and (2) $5 million in litigation rights against FENB given the State Court Action's dismissal with prejudice. And because the additional $6.8 million bears no reasonable relationship to the damages FENB—or Claimant—could have anticipated flowing from the breach, it is an unenforceable penalty and forfeiture under state law. This is true whether or not a failure to satisfy a condition precedent triggered the increased payment. And it is immaterial how the clause is styled—either as a discount upon full compliance or a penalty upon noncompliance. Conditions precedent masked as penalties are still unenforceable penalties. That being said, Debtor fails to see how the $6.8 million penalty is reasonably related to FENB's damages. At most, it suffered $1.7 million in damages—the unpaid taxes it would need to pay to stop the tax sale. Even then, however, the equity cushion would increase by the amount paid so, arguably,

FENB would sustain no damages whatsoever.

In addition, Debtor also owed an $8.5 million balloon payment as of March 1, 2016. The same analysis with respect to the delinquent property taxes likewise applies to it. The damages from failure to pay money are equal to the interest on the amount due at the current prevailing interest rate. Under no circumstances, then, would the delinquent $8.5 million payment occasion anything like $6.8 million in damages to FENB or Claimant. This is another unenforceable penalty under state law. Because the $6.8 million Debtor would be obligated to pay on account of either the delinquent property taxes or the late $8.5 million lump sum payment are unenforceable penalties or forfeitures under California law, Debtor simply does not owe it. Section 1123 would thus not be needed except with respect to default interest and late fees, if any.

Debtor next argues that penalties and forfeitures are similarly disfavored under federal law. It cites various bankruptcy cases for the proposition that a breach resulting in forfeiture must be substantial for the court to find it incurable and the property right forfeited. And it is insufficient to rely on a contract's plain language in determining whether a breach will result in a forfeiture or termination of property rights due to an inability to cure; rather, the particular facts and circumstances must be examined to determine whether the breach is material or economically significant. Applying this "materiality test," Claimant cannot show any economic or otherwise substantial detriment from Debtor's failure to timely pay the property taxes. Claimant voluntarily purchased the note in February 2015, long after the March 23, 2014 deadline. It was thus fully aware of Debtor's alleged default when it bought the loan, and could have chosen not

to do so. In addition, the untimely tax payment will not damage Claimant unless the property is worth less than $6 million plus the unpaid taxes. Debtor believes the property is worth at least $44 million. Further, Claimant purchased the note for only $6 million, yet Debtor proposes to pay: (1) $1.7 million in property taxes; (2) the $8.5 million lump sum payment; and (3) accrued interest, attorneys' fees, and other allowable charges. If Debtor is entitled to the $6.8 million discount, Claimant will still see a handsome profit.

The same holds true for FENB. Debtor's failure to timely pay the property taxes was not material and FENB suffered no economic detriment from it. The Settlement Agreement included the tax payment provisions because the parties believed, at the time they signed it, that the property would likely be included in the March 2014 tax sales by the tax assessor's office. That never happened. In addition, FENB: (1) did not pay the taxes itself, even though it had the right to do so; and (2) continued accepting Debtor's monthly interest-only payment and did not record a default notice until August 2014. This shows a lack of materiality or urgency in FENB's view. Further, the property's value has increased by at least $10 to $20 million since December 2013, which counters any economic harm to Claimant or FENB. On the other hand, Debtor and its creditors will suffer substantial harm if it does not receive the discount. Debtor gave up $5 million in litigation rights against FENB, and would need to come up with another $7 million to exit Chapter 11. Yet Claimant would receive a $6.8 million windfall.

Debtor next asserts that the note's ownership is unclear. Claimant filed paperwork in state court showing a February 23, 2015 endorsement to Ronald Richards ("Mr. Richards"). But the Claim includes an undated endorsement to Claimant. Claimant thus lacks standing until this issue is resolved.

Debtor also believes that FENB's prior breach excused its obligations under the Settlement Agreement. Specifically, the underlying loan documents remain in effect to the extent not revised by the Settlement Agreement. And § 8.1(c) of the Loan Agreement states that, other than with respect to payments to FENB and certain immaterial covenants, Debtor is entitled to 30 days' notice to cure any default and, if it does so, shall not be in default. This cure provision—which does not conflict with the Settlement Agreement because it is silent as to cure—provides a condition precedent to there being a non-curable default other than one involving paying FENB, namely that FENB must provide 30 days' notice to cure. And FENB failed to comply with this provision by twice declaring a default—once on less than 30 days' notice and the other without any notice. As a result, Debtor still has the right to cure any alleged default, and Claimant may not enforce that portion of the Settlement Agreement. FENB's breach therefore excused Debtor's performance under the Settlement Agreement.

Finally, Debtor renews its argument that the Claim is otherwise overstated. Again, Claimant fails to explain what charges are included in the additional $1,049,269.11 ($16,428,631.60—the Total Indebtedness). If Debtor is entitled to the $6.8 million discount, it believes the total amount due is $9,307,500. Otherwise, the amount owed should be $15,379,362.49.

Claimant, for its part, urges the court to deny Debtor's reconsideration request because it fails to meet FRCP 54(b)'s requirements. Specifically, the court has already considered and rejected Debtor's argument that its default under the Settlement Agreement and failure to satisfy a

condition precedent are immaterial and can be cured. In addition, the court has already overruled without prejudice Debtor's objection that the Claim lacks sufficient documentation or substantiation. The court has likewise disagreed with Debtor's contention that FENB breached first. Indeed, it has held that Debtor: (1) defaulted on and failed to satisfy a condition precedent under the Settlement Agreement; (2) has no right to cure its default; and (3) cannot restore, reinstate, or resurrect the failed condition precedent. Debtor has therefore failed to demonstrate a change in law, new evidence, or that the Order was based on clear error or would work manifest injustice.

Claimant further argues that requiring Debtor to pay the Total Indebtedness is neither a penalty nor a forfeiture. Debtor admits the Total Indebtedness. Under the Settlement Agreement, it would receive the $6.8 million discount only if it paid delinquent property taxes, made the $8.5 million lump sum payment, and did not trigger any other default events. Debtor failed both conditions, and the right to the reduced payoff never arose. There was consequently no penalty or liquidated damages, and nothing to forfeit. And CC § 1671(b)'s plain language and legislative history make clear that a liquidated damages provision's validity depends upon its reasonableness at the time the contract was made, not as it appears in retrospect.

In addition, Claimant likens the present situation to *Jade Fashion & Co., Inc. v. Harkham Indus., Inc.*, 229 Cal.App.4th 635, 177 Cal.Rptr.3d 184 (2014), which holds that there is no penalty or forfeiture when a debtor contractually admits the total indebtedness and fails to satisfy conditions precedent to a future debt reduction. Further, interest-only payments based on the discounted loan balance cannot be characterized as forfeiture. And the

Settlement Agreement's structure—a future debt reduction based on conditions precedent being satisfied—is not present in Debtor's various authorities.

Importantly, Claimant contends, Debtor fails to prove an unenforceable penalty under CC § 1671(b). At the time the parties entered the Settlement Agreement, Debtor was delinquent on property taxes and, as a result, a priority tax lien was already in place. And Debtor's own evidence establishes that the parties' mutual understanding, at the time the Settlement was entered, was that there was a substantial risk the property would be included in the March 2014 defaulted tax sales by the tax assessor's office. If Debtor defaulted on its tax obligations, then: (1) the property would be foreclosed on; (2) FENB would lose its only collateral; and (3) the undisputed amount due would be the Total Indebtedness. As of December 2013, the Total Indebtedness bore a reasonable relationship to the possible actual damages FENB would incur.

As for FENB's alleged breach, Claimant's interpretation of the Settlement Agreement differs from Debtor's. In particular, a 30–day notice provision with a right to cure would conflict directly with the Settlement Agreement's requirement that all delinquent property taxes be paid by March 23, 2014. Debtor further obfuscates § 3.5 of the Settlement Agreement, which merely clarifies that the underlying loan documents remain unmodified except as set forth in the agreement itself. The Settlement Agreement, a fully integrated writing, contains no notice of default or right to cure clauses. In addition, Debtor is factually incorrect because it received both the First Default Letter and the Second Default Letter. Simply put, FENB did not breach the Settlement Agreement.

Claimant also asserts that it is the Claim's undisputed owner. It acknowl-

edges that it filed incorrect paperwork in state court. But it promptly submitted a notice of errata establishing that it is FENB's assignee and the Claim's legal owner (ECF No. 208, pp. 29–31).

Finally, Debtor's argument that the Claim lacks sufficient documentation or substantiation is identical to the First Claim Objection—which the court rejected. Nevertheless, Claimant provides a April 1, 2016 loan statement showing that the amount due now exceeds the Total Indebtedness (ECF No. 208, p. 40).

In .reply, Debtor emphasizes that it is not seeking reconsideration of the court's rejection of a § 1123(a)(5)(G) cure. Instead, it requests a finding that the Settlement Agreement—notwithstanding the condition precedent issue—contains an unenforceable penalty. To that end, Debtor again relies on *Grand Prospect Partners, L.P. v. Ross Dress for Less, Inc.*, 232 Cal.App.4th 1332, 182 Cal.Rptr.3d 235 (2015) and related authorities for the proposition that cloaking an obligation in condition precedent language does not insulate it from state law penalty analysis. It is possible for a condition precedent to operate as a penalty, and phrasing payment forfeiture in conditional language does not exempt it from judicial scrutiny.

Debtor further points out the various events of default under the Settlement Agreement, including late payments or failure to perform any obligation under the Loan Agreement. The extra $6.8 million would be due under any default event regardless of its significance. It "was intended as a hammer to compel performance; it was not intended to compensate FENB for $1.7 million in unpaid taxes." And this holds true for the property taxes. Had the $6.8 million charge been intended to compensate FENB for Debtor's failure to pay taxes, it would have been limited to, at most, the tax amount FENB was required

to pay to protect its position. Put differently, the parties' "one size fits all" approach to the Settlement Agreement gave no consideration to defaults of varying severity and the damages that might flow from them. The $6.8 million conditional discount was designed to compel performance rather than compensate FENB for actual default damages. To that end, FENB had ample remedies without resort to a penalty.

In addition, the penalty analysis applies to both consumer and commercial transactions. And contractual performance inducements that serve as penalties—purportedly a common practice—are trumped by contrary public policy.

Debtor also contends that *Jade Fashion* is both factually distinguishable and a legal "outlier" having no bearing on this case. Claimant likewise misstates the law when suggesting that the absence of installment payments has some legal significance. Nevertheless, like an installment contract, Debtor's failure to timely pay the property taxes resulted in a disproportionate penalty or forfeiture by virtue of its dismissed litigation claims against FENB and the $6.8 million discount's elimination. Those consequences bear no reasonable relationship to any of FENB's contemplated damages for failure to pay the taxes. In other words, there is no relationship between the default damages and the $6.8 million, and Claimant cannot point to any.

Debtor again advances its argument that the Claim lacks sufficient documentation or substantiation. It not only disputes liability but also indicates how much it believes is owed. To that end, if the court finds that Claimant has done enough to prevent the Claim's disallowance, Debtor asks the court to defer ruling on this portion of the claim objection pending further discovery.

Finally, Debtor still believes that the note's ownership is unclear. Specifically, Claimant: (1) provides no admissible evidence of appropriate assignment documents; and (2) filed assignment documents with those court dated one day before it even existed.

The court heard argument on April 27, 2016 and took the matter under submission. Having considered the parties' respective briefs, evidence, and zealous advocacy at the April 27, 2016 hearing, the court now **overrules** Debtor's claim objection.

### Legal Standards

#### Claim Objections

■ Section 502(a) provides that a proof of claim is "deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). FRBP 3007 "implements the statutory command that claims be 'deemed allowed' unless a party in interest 'objects,' by requiring that an objection to claim be in writing and filed and by requiring notice to the creditor of the objection to claim at least 30 days before the hearing on the objection." *In re Dynamic Brokers, Inc.*, 293 B.R. 489, 496 (9th Cir. BAP 2003) (quoting FED. R. BANKR. P. 3007(a)). Filing a formal claim objection "trumps the 'deemed allowed' status and necessitates formal allowance of the claim." *Id.*

■ Rule 3001(f) "prescribes the evidentiary effect of a proof of claim that is executed and filed in accordance with the rules constitutes 'prima facie evidence of the validity and amount of the claim.'" *In re Garvida*, 347 B.R. 697, 706 (9th Cir. BAP 2006) (quoting *In re Garner*, 246 B.R. 617, 621 (9th Cir. BAP 2000)). And "although the creditor bears the ultimate burden of persuasion, the debtor must come forward with evidence to rebut the presumption of validity." *Diamant v. Kasparian (In re S. Cal. Plastics, Inc.)*, 165 F.3d

1243, 1248 (9th Cir. 1999); *see also In re Consol. Pioneer Mortg.*, 178 B.R. 222, 226 (9th Cir. BAP 1995) ("Upon the filing of an objection, the objecting party must produce evidence tending to defeat the claim that is of a probative force equal to that of the creditor's proof of claim."). If a debtor accomplishes this, the burden then reverts to the claimant to prove the claim's validity by a preponderance of the evidence. *In re Consol. Pioneer Mortg.*, 178 B.R. at 226 (quoting *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173–74 (3d Cir. 1992)).

#### Reconsideration Under FRCP 54(b)

■ FRCP 54(b) addresses judgment on multiple claims or involving multiple parties. And it provides that:

> When an action presents more than one claim for relief—whether as a claim, counterclaim, crossclaim, or third-party claim—or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

FED. R. CIV. P. 54(b). FRCP 54(b) "controls the analysis of finality of judgments for purposes of appeal in federal civil actions, including bankruptcy adversary proceedings." *In re Belli*, 268 B.R. 851, 855 (9th Cir. BAP 2001) (citing FED. R. CIV. P. 54(b)). Absent a FRCP 54(b) certification or order expressly determining that: (1) there is no just reason to delay; and (2) an express direction that judgment be en-

tered, the order is interlocutory and not appealable as a final order. *In re Belli*, 268 B.R. at 855–56. In addition, the order can be revised "at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." *Id.* at 856 (citing FED. R. CIV. P. 54(b)).

 The Order is indeed interlocutory. To start, the court overruled the First Claim Objection without prejudice to further objections based on other issues that were not raised. And as discussed at the January 29, 2016 hearing, the parties agreed that additional motion practice on the Claim would be needed. In addition, the court did not issue a FRCP 54(b) certification on the Order. Nor did it adjudicate all of the parties' respective rights and liabilities pertaining to the Claim. The court may therefore revise or revisit its findings in the Order. And in the Ninth Circuit,

> The general rule regarding the power of a district court to rescind an interlocutory order is as follows: "As long as a district court has jurisdiction over the case, then it possesses the inherent procedural power to reconsider, *rescind*, or modify an interlocutory order for cause seen by it to be sufficient." *Melancon v. Texaco, Inc.*, 659 F.2d 551, 553 (5th Cir. 1981) (emphasis added); *see also Toole v. Baxter Healthcare Corp.*, 235 F.3d 1307, 1325 (11th Cir. 2000) (stating that when a district court issues "an interlocutory order, the district court has plenary power over it and this power to reconsider, revise, alter or amend the interlocutory order is not subject to the limitations of Rule 59"); *High Country Arts and Craft Guild v. Hartford Fire Ins. Co.*, 126 F.3d 629, 635 (4th Cir. 1997) (same); *Wagoner v. Wagoner*, 938 F.2d 1120, 1122 n. 1 (10th Cir. 1991) (same).

*City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001); *see also Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1124 (9th Cir. 2005) ("[W]e have long recognized 'the well-established rule that a district judge always has power to modify or to overturn an interlocutory order or decision while it remains interlocutory.'") (quoting *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963)); *Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 465 (9th Cir. 1989) ("Courts have inherent power to modify their interlocutory orders before entering a final judgment.") (citing *Marconi Wireless Tel. Co. v. United States*, 320 U.S. 1, 47–58, 63 S.Ct. 1393, 87 L.Ed. 1731 (1943)). In addition, the court has authority, as a "court[ ] of equity[,] 'to reconsider, modify or vacate [its] previous orders so long as no intervening rights have become vested in reliance on the orders.'" *Zurich Am. Ins. Co. v. Int'l Fibercom, Inc. (In re Int'l Fibercom, Inc.)*, 503 F.3d 933, 940 (9th Cir. 2007) (quoting *Meyer v. Lenox (In re Lenox)*, 902 F.2d 737, 740 (9th Cir. 1990)).

 Although the court is not limited to FRCP 59(e)'s requirements, reconsideration under that standard is appropriate if: (1) the court is presented with newly discovered evidence; (2) the court committed clear error or the initial decision was manifestly unjust; (3) there is an intervening change in controlling law; or (4) other, highly unusual circumstances warranting reconsideration. *Sch. Dist. No. 1J, Multnomah Cnty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993) (citing *All Haw. Tours, Corp. v. Polynesian Cultural Ctr.*, 116 F.R.D. 645, 648 (D. Haw. 1987), *rev'd on other grounds*, 855 F.2d 860 (9th Cir. 1988)); *see also Kona Enter. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000) (same). "[A] motion for reconsideration under Rule 59 is not intended merely to relitigate old matters

already considered or give a disappointed litigant another chance." *In re Hillis Motors, Inc.*, 120 B.R. 556, 557 (Bankr. D. Haw. 1990) (quoting *Agola v. Hagner*, 678 F.Supp. 988, 991 (E.D.N.Y. 1987)).

### Contract Interpretation Under California Law

■■■■ The rules regarding the formation and interpretation of contracts govern the analysis of settlement agreements. *Timney v. Lin*, 106 Cal.App.4th 1121, 1127, 131 Cal.Rptr.2d 387 (2003). Settlement agreements embody compromises in which each side gives up something it might have won in litigation and waives its right to litigate. The court's role is to construe a settlement agreement as written, as it would any other contract. *See U.S. v. Armour & Co.*, 402 U.S. 673, 681, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971) (discussing interpretation of consent decree). While a settlement agreement is a contract, there may be significant differences in the way any particular settlement agreement operates. *See Archer v. Warner*, 538 U.S. 314, 323, 123 S.Ct. 1462, 155 L.Ed.2d 454 (2003) (describing settlement agreement and releases as a "kind of novation" which do not bar claim that settlement debt arose out of false pretenses, false representation or actual fraud); *In re Worldcom, Inc.*, 382 B.R. [610] at 623 [(Bankr. S.D.N.Y. 2008)] (discussing determination under state law as to whether settlement agreement is accord and satisfaction, novation, or substituted agreement and differing results flowing from this determination).

■■■■ *In re VEC Farms, LLC*, 395 B.R. 674, 685 (Bankr. N.D. Cal. 2008). Section 15.0 of the Settlement Agreement provides that it has been entered into and is to be performed and enforced in California. The Settlement Agreement at p. 8.

The same is true under § 9.5 of the Loan Agreement. The Loan Agreement at p. 42. Under California law,

> The fundamental goal of contract[ ] interpretation is to give effect to the mutual intention of the parties. If contractual language is clear and explicit, it governs. *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 10 Cal.Rptr.2d 538, 833 P.2d 545, 552 (1992) (citing Cal. Civ. Code, §§ 1636, 1638); *see also Shaw v. Regents of Univ. of Cal.*, 58 Cal.App.4th 44, 67 Cal.Rptr.2d 850, 856 (1997) ("Although the intent of the parties determines the meaning of the contract ( [Cal.] Civ.Code, §§ 1636, 1638), the relevant intent is 'objective'—that is, the objective intent as evidenced by the words of the instrument, not a party's subjective intent."). In interpreting the contract, a court must consider two questions: (1) whether the writing was intended to be the complete and final expression of the parties' intent and (2) whether the agreement is susceptible to the meaning given to it by the parties. *See Brinderson–Newberg Joint Venture v. Pac. Erectors*, 971 F.2d 272, 276–77 (9th Cir. 1992); *Banco Do Brasil, S.A. v. Latian, Inc.*, 234 Cal.App.3d 973, 285 Cal.Rptr. 870, 885 (1991).

*Renwick v. Bennett (In re Bennett)*, 298 F.3d 1059, 1064 (9th Cir. 2002). The court thus begins by examining the Settlement Agreement and the Loan Agreement's language. *In re Tills*, 419 B.R. 444, 450 (Bankr. S.D. Cal. 2009) (citing CAL. CIV. CODE § 1639). If the contract is fully integrated, then parol evidence concerning terms not specifically included in the agreement is generally not permitted. *In re Bennett*, 298 F.3d at 1064 (citing *Banco Do Brasil*, 285 Cal.Rptr. at 885 ("where the parties to a contract have set forth the terms of their agreement in a writing which they intend as the final and complete expression of their understanding, it

is deemed integrated and may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement.")). But parol evidence is admissible to interpret express terms if the contract is "ambiguous and reasonably susceptible to the proffered meaning ·...." *In re Bennett*, 298 F.3d at 1064 (citing *Brinderson-Newberg*, 971 F.2d at 277); *see also In re Tills*, 419 B.R. at 450 ("the Court would consider extrinsic evidence only to interpret existing terms that are 'ambiguous.'").

### Penalties and Forfeitures Under California Law

A penalty is "an extra charge against a party who violates a contractual provision." BLACK'S LAW DICTIONARY 1247 (9th ed. 2009). Put differently:

> A *penalty* is a sum which a party ... agrees to pay or forfeit in the event of a breach, but which is fixed, not as a pre-estimate of probable actual damages, but as a *punishment*, the threat of which is designed to prevent the breach, or as *security*, where the sum is deposited or the covenant to pay is joined in by one or more sureties, to insure that the person injured shall collect his actual damages. Penalties ... are not recoverable or retainable as such by the person in whose favor they are framed ....

*Id.* (quoting Charles T. McCormick, *Handbook on the Law of Damages* § 146, at 600 (1935)). In addition, a penalty can be "[e]xcessive stipulated damages that a contract purports to impose on a party that breaches. If the damages are excessive enough to be considered a penalty, a court will usu. not enforce that particular provision of the contract ...." BLACK'S LAW DICTIONARY 1247; *see also Freedman v. Rector, Wardens & Vestrymen of St. Mathias Parish*, 37 Cal.2d 16, 21–22, 230 P.2d 629 (1951) ("A penalty need not take the form of a stipulated fixed sum; any provision by

which money or property would be forfeited without regard to the actual damage suffered would be an unenforceable penalty.") (quoting *Ebbert v. Mercantile Trust Co.*, 213 Cal. 496, 499, 2 P.2d 776 (1931)).

CC § 1671 applies when determining the validity of a contractual provision liquidating damages for a breach. In particular, subsection (b) provides that "a provision in a contract liquidating the damages for the breach of the contract is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made." CAL. CIV. CODE § 1671(b).

 The Law Revision Commission Comments to CC § 1671(b) make clear that the burden of proving reasonableness is on the party seeking to invalidate the liquidated damages provision. Further, the circumstances that the court may take into account in determining reasonableness are those that existed at the time the contract was made—not as it appears in retrospect. The amount of actual damages suffered, therefore, has no bearing on the liquidated damages provision's validity. In addition, the parties have considerable leeway in setting damages for breach. Indeed, "all the circumstances existing at the time of the making of the contract are considered, including the relationship that the damages provided in the contract bear to the range of harm that reasonably could be anticipated at the time of the making of the contract." CAL. CIV. CODE § 1671 cmt. b (1977). Other relevant considerations in determining reasonableness include, but are not limited to:

> (1) the relative equality of the parties' bargaining power;
>
> (2) whether the parties were represented by lawyers at the time the contract was made;

(3) the parties' anticipation that proof of actual damages would be costly or inconvenient;

(4) the difficulty of proving causation and foreseeability; and

(5) whether the liquidated damages provision is included in a form contract.

*Id.* California courts follow the above principles. For instance, the Third District Court of Appeal has recently stated:

A liquidated damages clause will generally be considered unreasonable, and hence unenforceable under section 1671(b), if it bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach. The amount set as liquidated damages "must represent the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained." [Citation.] "A penalty provision operates to compel performance of an act [citation] and usually becomes effective only in the event of default [citation] upon which a forfeiture is compelled without regard to the damages sustained by the party aggrieved by the breach [citation]. The characteristic feature of a penalty is its lack of proportional relation to the damages which may actually flow from failure to perform under a contract. [Citations.]" [Citation]. "In short, "[a]n amount disproportionate to the anticipated damages is termed a "penalty." A contractual provision imposing a "penalty" is ineffective, and the wronged party can collect only the actual damages sustained." *Ridgley v. Topa Thrift & Loan Ass'n*, 17 Cal.4th 970, 977–78, 73 Cal.Rptr.2d 378, 953 P.2d 484 (1998).

*McGuire v. More–Gas Inv., LLC*, 220 Cal. App.4th 512, 163 Cal.Rptr.3d 225, 234–35 (2013); *see also Grand Prospect Partners, L.P.*, 232 Cal.App.4th at 1358, 182 Cal.

Rptr.3d 235 ("The general rule for whether a contractual condition is an unenforceable penalty requires the comparison of (1) the value of the money or property forfeited or transferred to the party protected by the condition to (2) the range of harm or damages anticipated to be caused that party by the failure of the condition.").

▮▮▮▮ Whether a contractual provision is an unenforceable penalty is a legal question that the "trial court decides, in light of all the facts, including the whole instrument ...." *Grand Prospect Partners, L.P.*, 232 Cal.App.4th at 1354–55, 182 Cal.Rptr.3d 235. The court must look to the contract's substance to determine its meaning. *Greentree Fin. Grp., Inc. v. Executive Sports, Inc.*, 163 Cal.App.4th 495, 499, 78 Cal.Rptr.3d 24 (2008); *see also McGuire*, 220 Cal.App.4th at 523, 163 Cal. Rptr.3d 225 ("Our Supreme Court has 'consistently ignored form and sought out the substance of arrangements which purport to legitimate penalties and forfeitures.'") (quoting *Garrett v. Coast & S. Fed. Sav. & Loan Ass'n*, 9 Cal.3d 731, 737, 108 Cal.Rptr. 845, 511 P.2d 1197 (1973)). Indeed, "in evaluating the legality of a provision, a court must first determine its true function and operation." *In re Cellphone Termination Fee Cases*, 193 Cal. App.4th 298, 328, 122 Cal.Rptr.3d 726 (2011). That being said,

The public policy expressed in Civil Code sections 1670 and 1671 *may not be circumvented by words used in a contract*; that whether or not a particular clause is a penalty or forfeiture or a bona fide provision for liquidated damages depends upon the actual facts existing at the time the contract is executed and whether or not, in fact, it was then impracticable or extremely difficult to fix actual damages and that the parties did in fact then make a good faith and reasonable effort to do so; that a litigant

seeking the benefits of a clause purporting to fix liquidated damages must plead and prove that the clause is valid under the fact which then existed.

*Purcell v. Schweitzer*, 224 Cal.App.4th 969, 975, 169 Cal.Rptr.3d 90 (2014) (emphasis in original). In addition, a contractual provision triggered by one or more conditions precedent can be deemed a penalty under California law. *Grand Prospect Partners, L.P.*, 232 Cal.App.4th at 1355, 182 Cal. Rptr.3d 235. "Phrasing a forfeiture of payment in conditional language does not exempt it from judicial scrutiny." *Id.* at 1356, 182 Cal.Rptr.3d 235. California does not allow unreasonable penalties or forfeitures because they are "imaginatively drafted as contractual conditions." *Id.*; *see also Root v. Am. Equity Specialty Ins. Co.*, 130 Cal. App.4th 926, 939–40, 30 Cal.Rptr.3d 631 (2005) (nonoccurrence of conditions precedent in contracts excused when nonoccurrence works a forfeiture). At the same time, however, "California courts have recognized that some conditional provisions in a contract do not operate as a forfeiture or penalty." *Grand Prospect Partners, L.P.*, 232 Cal.App.4th at 1357–58, 182 Cal. Rptr.3d 235 ("A contract provision that provides a party with a true alternative performance—that is, an alternative that provides a rational choice between two reasonable possibilities—does not involve an unenforceable penalty.") (examining *Blank v. Borden*, 11 Cal.3d 963, 115 Cal. Rptr. 31, 524 P.2d 127 (1974)).

■■■■ Forfeiture is "the loss of a right, privilege, or property because of a crime, breach of obligation, or neglect of duty." BLACK'S LAW DICTIONARY 722. A forfeiture clause is likewise "a contractual provision stating that, under certain circumstances, one party must forfeit something to the other. Forfeiture clauses are often held to be void, although they are similar to conditions and other qualifica-

tions of estates in land." *Id.* CC § 3275, which addresses forfeiture relief, provides:

> Whenever, by the terms of an obligation, a party thereto incurs a forfeiture, or a loss in the nature of a forfeiture, by reason of his failure to comply with its provisions, he may be relieved therefrom, upon making full compensation to the other party, except in case of a grossly negligent, willful, or fraudulent breach of duty.

CAL. CIV. CODE § 3275; *see also Freedman v. Rector, Wardens & Vestrymen of St. Mathias Parish*, 37 Cal.2d 16, 20, 230 P.2d 629 (1951). The phrase "terms of an obligation" "includes the terms of a contract, even when those terms are drafted as conditions precedent." *Grand Prospect Partners, L.P.*, 232 Cal.App.4th at 1365, 182 Cal.Rptr.3d 235. The defaulting party "must plead and prove facts entitling it to relief under the section." *Am. Bankers Mortg. Corp. v. Fed. Home Loan Mortg. Corp.*, 75 F.3d 1401, 1413 (9th Cir. 1996) (citing *Barkis v. Scott*, 34 Cal.2d 116, 120, 208 P.2d 367 (1949) ("Section 3275 presupposes that the party seeking relief is in default, and in order to secure relief under its terms it is necessary for him to plead and prove facts that will justify its application.")).

■■■■ California law disfavors forfeiture. The Bankruptcy Court for the Central District of California has recently stated:

> The public policy that equity abhors forfeiture is also well represented in California law. California Civil Code § 1442; *Petersen v. Hartell*, 40 Cal.3d 102, 112, 219 Cal.Rptr. 170, 707 P.2d 232 (1985); *Reed v. South Shore Foods, Inc.*, 229 Cal.App.2d 705, 40 Cal.Rptr. 575 (1964); *Deutsch v. Phillips Petroleum Co.*, 56 Cal.App.3d 586, 128 Cal.Rptr. 497 (1976). California Civil Code § 1442 specifically provides: "A condition involving a forfei-

ture must be strictly interpreted against the party for whose benefit it is created." The policy of abhorring forfeitures has been followed in the case law wherein courts have strictly construed the language of contracts to avoid forfeiture. *See, e.g., Randol v. Scott*, 110 Cal. 590, 595–596, 42 P. 976 (1895) (strictly construing language of a contract calling for forfeiture of a lease upon the assignment by the co-lessees not to be triggered upon an assignment by operation of law by the bankruptcy of one co-lessee; opinion stating that forfeiture clauses are to be "restrain[ed] ... to the most technical limits of the terms and conditions upon which the right is to be exercised"). However, court have also held that California Civil Code § 1442 does not warrant a strained or overly technical construction or artificial distinction where forfeiture is plainly required by the express language of a written instrument.

*In re Art & Architecture Books of the 21st Century*, 518 B.R. 43, 50 (Bankr. C.D. Cal. 2014); *see also In re Kitchen*, 192 Cal. 384, 387–91, 220 P. 301 (1923); *Fed. Farm Mortg. Corp. v. Davis*, 132 F.2d 663, 664 (9th Cir. 1942) ("Our courts follow the accepted doctrine that equity will relieve even against an express provisions for forfeiture."). The breaching party may use CC § 3275 "as an equitable defense to enforcement of the contractual provision or as grounds for relief in an action for restitution of the property forfeited." *Ridgley*, 17 Cal.4th at 976, 73 Cal.Rptr.2d 378, 953 P.2d 484. In determining whether a given case falls under CC § 3275's requirements, the court must consider "the nature of the contract and the specific clause in question." *Holiday Inns of Am., Inc. v. Knight*, 70 Cal.2d 327, 330, 74 Cal.Rptr. 722, 450 P.2d 42 (1969).

## Legal Analysis and Discussion

### Debtor's Reconsideration Request Will Be Denied

As a preliminary matter, the parties argue extensively over whether Debtor is entitled to reconsideration. The court concludes that it is not.

As stated above, the Order is interlocutory because: (1) the court overruled the First Claim Objection without prejudice to Debtor bringing further objections based on the Claim's documentation or other issues not initially raised; (2) the parties agreed to further motion practice at the January 29, 2016 hearing; (3) the court neither issued a FRCP 54(b) certification nor adjudicated all of the parties' respective rights and liabilities pertaining to the Claim; and (4) no intervening rights have become vested in reliance on the Order. FRCP 54(b) thus applies to the Order. And the court may in its discretion exercise its statutory, equitable, and inherent powers to revise or revisit its prior findings. In this instance, however, it declines to do so.

 The court agrees with Debtor that FRCP 54(b)'s reconsideration standard is lower than FRCP 59(e) or 60(b)'s. And the court's inherent authority to revisit the Order is not subject to FRCP 59(e)'s limitations. But Debtor still needs to show sufficient cause to reconsider the Order. It provides none. Seeking reconsideration only because it is not satisfied with the First Claim Objection's outcome is not enough. Further, Debtor does not: (1) provide previously undiscovered evidence; (2) argue that the court committed clear error or that its findings in the Order are manifestly unjust; (3) assert a change in the law; or (4) show other unusual circumstances warranting reconsideration. Quite the opposite, in fact. Debtor's reply specifically asserts that it is *not* asking the

court to change the finding that Debtor cannot, as a matter of law, use §§ 1123(a)(5)(G) and 1124(2) and *Entz–White* to reinstate the Settlement Agreement and cure all defaults thereunder—including the failure of the conditions precedent to take advantage of the discounted payoff. And it further concedes that its reconsideration request is a "misnomer" and that only limited reconsideration is needed, if at all.

That being said, it is apparent that the reconsideration aspect of the objection was brought out of an abundance of caution. Debtor believes that the relief it now seeks is consistent with the court's findings in the Order. And it only desires reconsideration to the extent that it is.

In any event, the court agrees that reconsideration of the Order is unnecessary. The Order addressed two discrete issues: (1) whether Debtor could cure its defaults under the Settlement Agreement using §§ 1123(a)(5)(G) and 1124(2) and *Entz–White*; and (2) whether the Claim should be disallowed for Claimant's failure to adequately explain the difference between the amount in the Claim and the Total Indebtedness. The First Claim Objection was overruled without prejudice to Debtor bringing further objections based on the Claim's documentation or other issues not raised. And the parties have previously agreed that further arguments would be briefed. Debtor's penalty/forfeiture, materiality, and note ownership arguments were not raised in the First Claim Objection—though they could have been. Because they are new arguments, the court will now consider them. In addition, the court held in abeyance the question of whether FENB's alleged breach excused Debtor's obligations under the Settlement Agreement. The parties agreed to this treatment, and thus the court will analyze the issue in this order. Finally, Debtor's

argument that the Claim is overstated was denied without prejudice—Debtor could renew it with sufficient evidence of: (1) what it actually owes Claimant; and (2) the $120,000 it allegedly paid Claimant in 2015. Debtor believes it has done so in the present objection, so the court will again address it.

Because Debtor has not demonstrated cause, the court in its discretion will not revisit the Order. The reconsideration request is therefore **denied.**

*The Additional $6.8 Million for Failure to Timely Pay the Delinquent Property Taxes Is Not a Penalty Under California Law and, even if It Were, Would Represent Acceptable Liquidated Damages; Loss of the Potential $6.8 Million Discount and the $5 Million Litigation Rights Against FENB Are Not Forfeitures Under California Law*

Debtor has now breached the Settlement Agreement in two ways. First, it did not pay the delinquent property taxes by the March 23, 2014 deadline. Second, it failed to make the $8.5 million lump sum payment by the March 1, 2016 deadline. The court has previously explained that these were conditions precedent to Debtor's receiving its debt reduction. Both needed to exist or occur before FENB's duty to perform arose, *i.e.*, before FENB was required to waive the difference between the $8.5 million lump sum payment and the Total Indebtedness. Debtor thus had a contingent right to a future debt reduction, subject to satisfying the above conditions precedent. It is undisputed that both conditions remain unperformed. And this has worked a default under § 4.0(a) of the Settlement Agreement. These breaches have two consequences: (1) they have put Debtor in default under the Settlement Agreement; and (2) they have prevented a condition precedent from being satisfied.

FENB's—and by extension, Claimant's—duty to waive the balance greater than the $8.5 million lump sum payment has never been triggered. And importantly, Debtor right to the future debt reduction has never arisen. Indeed, the right will never come into existence—it lapsed prepetition owing to Debtor's failure to make the delinquent tax payment. And it is logically and temporally impossible for Debtor cure either default at this point. It cannot go back in time and pay the taxes or make the lump sum payment before their respective deadlines. Both are incurable historic facts.

With that in mind, the court turns to the parties' respective arguments. Because of both the law's complexity and the structure of the parties' arguments, the court must conduct a multilayered analysis.

First, Debtor is arguing that requiring it to pay the additional $6.8 million for its defaults is a penalty or forfeiture under California law. But there are now two defaults: (1) the failure to timely pay the delinquent property taxes; and (2) the failure to timely make the $8.5 million lump sum payment. Under the Settlement Agreement, either occurrence would have triggered 3.1.5's requirement that Debtor pay the Total Indebtedness instead of the discounted amount. Accordingly, the court must analyze whether this is a penalty under either scenario.

The court must then determine whether Debtor's loss of the $5 million in litigation rights against FENB—which it dismissed with prejudice under § 5.0 of the Settlement Agreement—worked a forfeiture under California law. In conjunction with this analysis, the court will also address what, if anything, Debtor has forfeited under the Settlement Agreement.[1]

### Requiring Debtor to Pay the Additional $6.8 Million for Failure to Timely Pay the Delinquent Property Taxes Is Not a Penalty Under California Law

Debtor cites a plethora of authority in support of its position. Because the particular facts, analyses, and holdings of each case are relevant, a further discussion is appropriate.

### A. Case Overview

#### *Greentree Financial Group, Inc. v. Execute Sports, Inc.,* 163 Cal.App.4th 495 (2008)

In *Greentree,* the plaintiff ("Greentree") sued Execute Sports, Inc. ("Execute") for breach of contract, alleging that Executed failed to pay $45,000 for financial advisory services. On the first day of trial, the parties filed a notice of settlement, which was memorialized in a stipulated judgment. Under the stipulation, Execute would pay Greentree $20,000 in two installments. If Execute defaulted on either installment, then Greentree would be entitled to have judgment on the entire amount prayed in the complaint. Execute promptly defaulted on the first payment, and Greentree submitted a $61,232.50 proposed judgment—consisting of $45,000 in damages plus prejudgment interest, attorney fees, and costs. The court entered a $61,232.50 judgment in Greentree's favor, and Execute appealed.

Execute contended that the $61,232.50 judgment was an unenforceable penalty. Greentree argued that the stipulated amount was reasonably related to the damages Execute's breach caused. The Fourth District Court of Appeal, however, analyzed the breach of the stipulation, not the breach of the underlying contract. It

---

1. The parties seemingly use the terms "penalty" and "forfeiture" interchangeably. This is a misnomer since they are distinct concepts. with unique requirements under California law. Each doctrine must be analyzed separately.

determined that Greentree and Execute did not attempt to anticipate the damages that could flow from a breach of the stipulation. Instead, they simply selected the amount Greentree claimed as damages in the lawsuit. In addition, the $61,232.50 judgment bore no reasonable relationship to the range of actual damages the parties could have anticipated from breach of the stipulated $20,000 settlement—the judgment's amount was triple what the parties agreed to settle for.

Further, the judgment amount—roughly $40,000 more than the settlement—did not encourage Execute to make timely payment or compensate Greentree for loss of the money's use. Instead, it rewarded Greentree by penalizing Execute. And a $40,000 late payment penalty fee bore no reasonable relationship to any actual damages that might flow from Execute's failure to make the first $15,000 installment payment. The court reversed the judgment and remanded with directions to reduce the judgment against Execute to $20,000 plus post-judgment interest and costs.

### *Purcell v. Schweitzer*, 224 Cal.App.4th 969 (2014)

In *Purcell*, Purcell loaned Schweitzer $85,000. After Schweitzer defaulted on the note, Purcell brought a lawsuit seeking to recover the full amount owed. The parties then entered into a settlement agreement where Schweitzer agreed to pay Purcell $38,000 at 8.5% interest over 24 months. Under the repayment plan, the parties agreed that Schweitzer would make an initial $20,000 payment, followed by monthly payments, and then a final balloon payment. In addition, if any payment was late, an $85,000 judgment—the original liability—could be entered against Schweitzer. The settlement agreement included a stipulation for judgment. It provided that: (1) the parties agreed that the $85,000 was the amount actually owed; and (2) this

amount was neither a penalty nor a forfeiture. Further, Schweitzer purportedly waived his right to set aside any judgment under CC § 3275.

Schweitzer failed to make a payment on time, and Purcell obtained a $58,829.35 judgment. Schweitzer then sought to set it aside, asserting that the stipulation and resultant judgment represented an unlawful penalty for breaching the settlement agreement. In opposition, Purcell argued that the agreement anticipated Schweitzer's strict compliance and materially differed from other installment agreements since: (1) Schweitzer expressly agreed that if he defaulted, the amount full amount would be owed and was not a penalty or forfeiture; (2) the judgment was Purcell's actual damages; and (3) Schweitzer waived his right to challenge the amount. The trial court set aside the default judgment, finding that Purcell's damages bore no rational relationship to those he would actually suffer as a result of Schweitzer's breach. Purcell appealed.

Analyzing CC § 1671, the Fourth District Court of Appeal noted that a liquidated damages clause becomes an unenforceable penalty if it bears no reasonable relationship to the range of actual damages the parties could have anticipated flowing from the breach. In other words, the liquidated sum must be the result of the parties' reasonable endeavor to estimate the fair average compensation for any loss incurred. Absent such a relationship, a liquidated damages clause is an unenforceable penalty.

Purcell argued that *Greentree* was distinguishable because it did not involve an express waiver of any challenges to the stipulated judgment. But the court also found *Greentree* instructive. In addition, the parties agreed that the stipulated judgment reflected the proceeding's economics. The court disagreed, noting that

CC §§ 1670 and 1671's public policy may not be circumvented by a contract's language. Rather, whether a clause is a penalty or forfeiture as opposed to a bona fide liquidated damages provision depends on: (1) the facts existing at the contract's inception; (2) whether it was then impracticable or extremely difficult for the parties to fix actual damages; and (3) whether the parties made a good faith and reasonable effort to fix actual damages. Purcell, as the party seeking the clause's benefits, bore the burden of proving its validity. And CC § 1671's applicability depends upon the actual facts, not the words used in the contract.

The court found that the stipulated judgment was an unenforceable penalty because it bore no reasonable relationship to the damages Purcell could have anticipated suffering by Schweitzer's breach. The court also looked at the payment plan itself, noting that Purcell incurred no damages because the judgment was entered after payment was accepted.

In addition, the court rejected Purcell's argument that the $85,000 reflected the economics of proceeding with the lawsuit. Simply put, there was nothing in the record to show that obtaining a judgment and instituting post-judgment procedures would cost that much. This language, the court held, was an attempt to circumvent CC § 1671's requirements.

### *Holiday Inns of America, Inc. v. Knight,* 70 Cal.2d 327 (1969)

In *Holiday Inns*, the plaintiffs were successors-in-interest to the optionee under a written option contract with Knight to purchase real property. Unless cancelled, the option could be exercised by giving written notice by a date certain. The contract provided for an initial $10,000 payment, followed by four $10,000 payments unless the option was exercised or cancelled. A late payment would automatically result in cancellation. Plaintiffs made the first three installment payments and invested significant resources developing commercial and residential property next to the option property. But the fourth payment was a day late, causing Knight to return it and declare the option contract cancelled. Further payment attempts were likewise refused.

The plaintiffs urged the court to relieve them from forfeiture and declare the option in force under CC § 3275. The Supreme Court of California obliged. Specifically, it noted that CC § 3275's proscription against forfeiture applies in any case where a party: (1) seeks relief from default and has brought himself within the section's requirements; and (2) has pleaded and proven facts justifying the section's application. And to determine whether a case falls under § 3275's terms, a court must consider both the contract's nature and the specific clause in question.

The court focused on whether the plaintiffs' continuing future right to exercise the option was forfeited by the late payment. Knight argued that there was no forfeiture since the plaintiffs got exactly what they bargained for, namely the right to buy the property for three years during which they made payments. The court disagreed, finding that the "economic realities" did not support Knight's position. It reasoned that each $10,000 payment was partially an option to buy land during a given year and partially a renewal of the option for another year, up to five years. And as time went on, the plaintiffs paid more and more for the renewal rights—this is what they forfeited. When Knight declared forfeiture, the plaintiffs had paid $30,000 on the option over the previous two years. They therefore did not receive the "benefit of their bargain." Indeed, they lost more than that. The court found that the plaintiff's

suffered forfeiture of that part of the $30,000 attributable to the right to exercise the option during the past two years. In addition, it found persuasive the parties' respective positions: (1) the plaintiffs were willing and able to continue performance and acted in good faith; and (2) Knight did not suffer any injury or lose any reasonable expectations, and would in fact receive the benefit of his bargain (the option's full price).

### Ridgley v. Topa Thrift & Loan Association, 17 Cal.4th 970 (1998)

In *Ridgley*, Robert M. Ridgley purchased property to build and market a luxury home. He took out a construction loan. But he also needed a short-term "bridge loan" between the construction loan and the buyer's permanent loan. Ridgley and Topa Thrift & Loan Association ("Topa") negotiated a $2.3 million note. It allowed for prepayment provided Ridgley paid Topa a prepayment charge comprising six months' interest. During negotiations, the parties added an addendum to the note stating that "[p]rovided all scheduled payments have been received not more than 15 days after their scheduled due date, and further provided that there have been no other defaults under the terms of this note or any other now existing or future obligation of borrower to Topa, then no prepayment charge will be assessed if this loan is paid in full after June 21, 1991." *Ridgley*, 17 Cal.4th at 974, 73 Cal.Rptr.2d 378, 953 P.2d 484.

Ridgley then sold the property. He did so before the loan matured and, upon Topa's demand, repaid the principal balance with the prepayment fee. Topa imposed the fee because Ridgley had been late with an interest payment. Ridgley brought suit against Topa for, *inter alia*, breach of contract and money paid by mistake. The trial court concluded that the prepayment clause was in fact a late charge and a penalty in the nature of a forfeiture. It then entered a $114,622.42 judgment in Ridgley's favor. The Court of Appeal reversed this decision, and Ridgley appealed to the Supreme Court of California.

The issue before the court was whether the prepayment provision in the note's addendum should be viewed as a prepayment charge or as a penalty for delinquency in a monthly interest payment. The court began by noting that a breaching party can raise CC § 3275 as an equitable defense to a contractual provision's enforcement, or as grounds for relief in a restitution action for forfeited property. In addition, a liquidated damages provision is enforceable only if determining actual damages was impracticable or extremely difficult. This provision is strictly applied in consumer goods and residential lease cases. But for other breach of contract cases, the rule is relaxed—a liquidated damages provision is valid unless the party seeking its invalidity shows that it was unreasonable under the circumstances when the contract was entered. And again, unreasonableness in this context requires a reasonable relationship between the actual damages the parties anticipated flowing from the breach and the liquidated damages clause itself. Absent such a relationship, it is an unenforceable penalty under CC § 1671. Further:

A penalty provision operates to compel performance of an act and usually becomes effective only in the event of default [citation] upon which a forfeiture is compelled without regard to the damages sustained by the party aggrieved by the breach [citation]. The characteristic feature of a penalty is its lack of proportional relation to the damages which may actually flow from failure to perform under a contract. [Citations]. (*Ibid.*). In short, "[a]n amount dispropor-

tionate to the anticipated damages is termed a 'penalty.' A contractual provision imposing a 'penalty' is ineffective, and the wronged party can collect only the actual damages sustained."

*Ridgley*, 17 Cal.4th at 977, 73 Cal.Rptr.2d 378, 953 P.2d 484 (internal quotations omitted). Comparing late payment fees to prepayment charges, the court noted that the latter are generally valid provisions for alternative performance, *i.e.*, not penalties imposed for defaults but rather an agreed form of compensation to the lender for interest lost through the prepayment. Thus, prepayment charge clauses are valid, whereas late payment fees must meet CC § 1671's reasonableness standard. The clause at issue in this case was both.

Analyzing substance over form, the invalidated the provision because it was intended to—and did—operate as a penalty for late payment. Regardless of form, the provision's intent and effect was that any late payment or other default would result in a penalty, namely Ridgley's inability to sell the property without payment of a large preset charge. Indeed, after the initial six months, Topa could not impose the prepayment penalty because Ridgley prepaid the loan before its maturity date and thus for the legitimate purpose of compensating for anticipated interest payments lost by prepayment. Because Topa limited its unconditional recovery of prepayment interest to the first six months, it was saying that this was enough to compensate it for any future lost interest payments. But it continued to hold over Ridgley's head a $113,000 prepayment penalty that could only be collected upon default.

Put differently, the court determined that the provision could not be regarded as a prepayment charge because the condition that limited its operation—a late interest payment—was not logically related to its function as compensation for prepay-

ment. Instead, it was intended as an incentive for prompt payment of interest. This alone was not fatal. But the problem was that the provision was not a reasonable attempt to anticipate damages from default. The court thus found the provision to be an unenforceable penalty.

### Grand Prospect Partners, LP v. Ross Dress for Less, Inc., 232 Cal.App.4th 1332 (2015)

In *Grand Prospect*, the plaintiff owned and operated a shopping center. Ross Dress for Less, Inc. ("Ross") agreed to lease space there. The lease agreement had an initial 10-year term with four option periods. It also contained a co-tenancy provision that required, throughout the lease's term, at least 70% of the leasable floor area in the center be occupied by retail tenants. Because an entity in the shopping center filed for bankruptcy and closed its doors, Grant Prospect could not meet the lease's opening co-tenancy requirement. The parties were unable to negotiate a modification and Ross ultimately opted not to open a store or pay rent. Eight months later, Grand Prospect notified Ross that it entered into a lease with Kohl's Department Stores. But Ross found that this did not cure the co-tenancy failure because Kohl's did not lease the required quantum of space and would not open within the 12–month cure period. Ross formally terminated the lease 30 days later.

Before Ross terminated the lease, however, Grand Prospect filed suit to declare the co-tenancy provisions to be unenforceable penalties. The trial court determined that they were, and struck them from the lease agreement. Without those provisions, Ross was in breach for failing to pay rent and terminating the lease. Ross appealed.

On the penalty issue, the Fifth District Court of Appeal first concluded that a contract provision triggered by one or

more conditions precedent can sometimes be deemed a penalty under California law. That is, the law does not allow unreasonable penalties or forfeitures simply because they are drafted as contractual conditions. Indeed, courts must examine substance over form in determining a provision's true function when evaluating its legality. But it also noted that some courts have found that certain conditional contractual provisions do not operate as a forfeiture or penalty. Thus, if it accords a party a true alternative performance—one that provides a rational choice between two reasonable possibilities—then it is not an unenforceable penalty. On this point, the court noted that Grand Prospect could not alternatively perform because, at the lease's inception, it did not own the space and could not control the entity's decision to cease operations.

The court then recited the same general penalty principles, *i.e.,* the reasonable relationship requirement, and applied them separately to each lease provision. And it determined the rent abatement provision to be an unenforceable penalty because "the value of the money or property forfeited or transferred to the party protected by the provision bears no reasonable relationship to the range of harm anticipated to be caused to that party by the failure of the provision's requirements." *Grand Prospect*, 232 Cal.App.4th at 1361, 182 Cal. Rptr.3d 235. In this case, Grand Prospect transferred possession to Ross and lost the right to receive monthly rent.

As to anticipated harm from the failure of conditions in the rent abatement provision, the appellate court agreed with the trial court that Ross did not expect any damage because the other entity would not be open on the lease's commencement date. And because there was no anticipated damage expected to flow from the entity's vacancy, the second part of the analysis—comparison of anticipated harm to value forfeited—weighed in Grand Prospect's favor. In sum, there was no reasonable relationship between the property value Grand Prospect forfeited and the anticipated harm to Ross. The rent abatement provision was therefore an unenforceable penalty.

Ross argued that CC § 3275 was inapplicable because the co-tenancy provisions were conditions, not obligations. The court rejected this argument, stating that "if a conditional provision in a contract constitutes an illegal penalty, then the affected party 'incurs a forfeiture' for purposes of Civil Code section 3275 and 'may be relieved therefore.'" *Grand Prospect*, 232 Cal.App.4th at 1365, 182 Cal.Rptr.3d 235. Put differently, if a conditional contractual provision meets the definition of an illegal penalty, then CC § 3275 applies to relieve the breaching party from the resulting forfeiture.

### *Harbor Island Holdings, LLC v. Kim,* 107 Cal.App.4th 790 (2003)

Debtor relies heavily on *Harbor Island Holdings, LLC v. Kim,* 107 Cal.App.4th 790, 132 Cal.Rptr.2d 406 (2003). In that case, the plaintiff ("Harbor Island") leased commercial property to E & J Textile Group, Inc. and James Y. Kim (collectively, "Kim"). The lease was supposed to last three years, but the parties extended it an additional three months. The original lease rent was $30,974.40 per month. But upon amendment, the parties agreed that: (1) the rent for the additional three months would be $96,364.80 per month; and (2) but half that amount—$48,182.40—would be conditionally deferred and ultimately forgiven if Kim complied with all obligations under the amended lease.

After a further extension, Kim vacated. Harbor Island then brought suit alleging that Kim breached by failing to: (1) maintain and repair the premises; and (2) pay

$240,912 in base rent—$48,182.40 per month—which recaptured the monthly rent's deferred portion that Harbor Island had not forgiven. Kim cross-complained, arguing that the deferred rent provision was an illegal penalty and thus unenforceable. The trial court denied Kim summary adjudication of the penalty issue, but the jury ultimately awarded him $37,633.60 (the $48,182.40 security deposit Harbor Island wrongfully withheld less the $13,970 in damages for Kim's failure to maintain or repair the premises). The trial court later reversed its prior position and held that the deferred rent provision was indeed invalid. Harbor Island appealed.

The Fourth District Court of Appeal first addressed whether the deferred rent provision was valid under CC § 1671. And like the cases described above, it analyzed whether the provision was unreasonable under the circumstances existing at the contract's inception. And to do that, it looked to *Ridgley*'s unreasonableness standard. The court noted that the original base rent was $30,974.40 per month. But it was $48,182.40 under the lease extension— subject to certain conditions precedent—a more than 55% increase. In the event of *any* breach, then, the rent would more than triple to $96,364.80. The court did not understand this, bluntly stating:

> Harbor Island gives a number of examples of the type of breach it could have used to show entitlement to the $240,912 it claimed in deferred rent. One of those examples is, "Failing to obtain and provide Harbor Island with copies of maintenance contracts to maintain certain critical aspects of the property." We are at an absolute loss to imagine how $48,182.40 per month, ultimately totaling $240,912 for the period in question, could have represented "the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained" for the

failure to provide copies of maintenance contracts.

*Harbor Island*, 107 Cal.App.4th at 796, 132 Cal.Rptr.2d 406. In addition, the court noted Harbor Island still had remedies if Kim breached the covenant to maintain and repair the premises. Indeed, the lease provisions concerning default remedies fully compensated Harbor Island—it took the matter to trial and recovered for the breach. It did not need to resort to the collection of another $240,912 as a penalty. Accordingly, the court found a lack of proportionality between the $240,912 Harbor Island sought and the actual damages it suffered from Kim's breach.

Harbor Island disagreed, arguing that the $240,912 was the full agreed-upon rent, which would be due if a condition precedent went unsatisfied. It did, however, admit that the parties did not try approximating damages. In any event, Harbor Island clearly wanted the $96,364.80 per month as security that Kim would perform his lease obligations. On this point, the court noted:

> If the sum extracted from the [obligor] is designed to exceed substantially the damages suffered by the [obligee], the provision for the additional sum, whatever its label, is an invalid attempt to impose a penalty inasmuch as its primary purpose is to compel prompt payment through the threat of imposition of charges bearing little or no relationship to the amount of the actual loss incurred
> . . . .

*Harbor Island*, 107 Cal.App.4th at 798, 132 Cal.Rptr.2d 406 (quoting *Ridgley*, 17 Cal.4th at 981, 73 Cal.Rptr.2d 378, 953 P.2d 484). The court thus concluded that the deferred rent provision was an unenforceable penalty.

## B. Analysis

California penalty and forfeiture statutes—and the cases interpreting them—

yield the following analytical framework. The court must determine whether requiring Debtor to pay the additional $6.8 million under § 3.1.5 of the Settlement Agreement for its failure to timely pay the delinquent property taxes is a penalty in the form of liquidated damages in the first place. If not, then CC § 1671 is inapplicable and the penalty inquiry ends. The only remaining question would be whether paying the additional $6.8 million constitutes forfeiture that Debtor can be relieved from. But if it is a penalty, the court must then decide whether it is invalid under CC § 1671's requirements. And if it is an unenforceable penalty, the court still must analyze whether it worked a forfeiture that Debtor may be relieved from under CC § 3275.

The court's initial focus will be on whether paying the additional $6.8 million—as opposed to losing entitlement to it—is a penalty or forfeiture. It will then ask the same question regarding Debtor's other default—the failure to make the $8.5 million lump sum payment by March 1, 2016. After that, the court will address whether Debtor's loss of entitlement to the $6.8 million discount—by virtue of either default—or lost litigation rights constitute forfeiture.

### The Alleged Penalty

■ The court concludes that requiring Debtor to pay the additional $6.8 million for its failure to timely pay the delinquent property taxes is not a penalty under California law. Under Recital L of the Settlement Agreement, Debtor admitted that it owed FENB the Total Indebtedness—$15,379,362.49—as of November 18, 2013. The parties did not pull this number out of thin air. Indeed, the Total Indebtedness is based on the amount owed under the Loan Agreement. It is Debtor's contractual obligation, and always has been. It is also Claimant's benefit of its bargain—it was entitled to that benefit if Debtor breached.

The conditional discount provision allowed Debtor to take advantage of an $8.5 million discounted payoff provided it did not miss the deadlines to pay the delinquent property taxes or the $8.5 million lump sum amount, or commit any other event of default. If it defaulted—which it did twice—the Total Indebtedness would be due and owing. This was not an extra charge or punishment for violating a contractual provision—it simply required Debtor to pay what it always owed. Debtor is not being forced to pay something new and separate from the underlying note obligation. The conditional discount was merely a potential reduction in liability subject to various conditions precedent. Debtor was not punished with an extraneous burden by not being able to reduce its original contractual liability. Nor was § 3.1.5 drafted to compel Debtor's performance. The provision is not injunctive. Nor is it a disguised penalty. It merely required Debtor to pay the full amount it contractually owed in the event of breach.

■ But even if it were a penalty in the form of liquidated damages under California law, it would still be subject to judicial scrutiny under CC § 1671. And for the following reasons, the court finds that Debtor fails to meet its burden for invalidating the provision.

As stated above, CC § 1671 places the onus on Debtor to establish that the provision was unreasonable under the circumstances existing *at the time the Settlement Agreement was entered.* The actual damages FENB or Claimant ended up suffering is irrelevant to this determination, *i.e.,* the court cannot look at damages in retrospect. To determine reasonableness, the court must consider whether the provision bears a reasonable relationship to the range of actual damages the parties could

have anticipated would flow from a breach. To do so, it must analyze the Settlement Agreement's substance over its form. And it must delve into the provision's true function and operation to ascertain whether the additional $6.8 million due upon Debtor's breach was a reasonable endeavor by the parties to estimate the fair compensation for Claimant's loss. The court recognizes that Debtor's recitation of the controlling case authorities is generally accurate. But the law is not on its side.

*Grand Prospect* held that contractual provisions triggered by one or more conditions precedent can be, but are not always, penalties under California law. Simply phrasing a purported penalty or forfeiture in conditional language does not exempt it from judicial scrutiny. That being said, various conditions precedent governed its entitlement to the discount, thus requiring FENB to waive the difference between the $8.5 million lump sum payment and the Total Indebtedness. Under California law, the court must still analyze this provision. It concludes that it is not an unenforceable penalty under CC § 1671.

Debtor argues that there is no reasonable relationship between the additional $6.8 million due for failure to timely pay the delinquent property taxes and the damages Claimant would suffer upon default. At most, FENB would have incurred $1.7 million in damages—the amount needed to stop the tax sale under § 3.1.1.2 of the Settlement Agreement. Even then, it urges, the equity cushion would increase by the amount paid, so there would arguably be no damages at all. The court disagrees. First, § 3.1.1.2 states that FENB *may* advance funds to stop a tax sale. It had the option, but was not required to do so. Any blame allocated to FENB for not paying the $1.7 million at any time after March 23, 2014 is misplaced. More importantly, according to Debtor's president,

Daryl Idler's ("Mr. Idler") declaration at Paragraph 8:

> The Settlement Agreement included the tax payment provisions because the parties believed, *when the Settlement Agreement was negotiated*, that there was substantial risk that the Real Property would be included in the March 2014 defaulted tax sales by the tax assessor's office.

ECF No. 193, p. 4 (emphasis supplied); *see also* ECF No. 192, p. 16. The parties agree that when they entered the Settlement Agreement, Debtor's property tax delinquency was about $1.7 million. As a result, there was a priority tax lien on the property that secured. Debtor's entire indebtedness to FENB. There was a substantial risk that it would be included in the March 2014 defaulted tax sales. If this were to happen, FENB would have lost its only collateral. Foreclosure on the senior tax lien would have wiped out its position. And it is entirely possible that the value of its paper would have dropped by $15 million or more. This is far greater than the $1.7 million FENB did not pay. Therefore, at the time the parties entered into the Settlement Agreement and drafted the tax provision, there was a reasonable relationship between the $6.8 million and the actual damages the parties could have anticipated flowing from Debtor's failure to pay the delinquent property taxes (the Total Indebtedness). So it was not simply a matter of paying the $1.7 million. Nor was it just a question of dollars—it was one of security. And it is reasonable to say that there is a logical connection between the $6.8 million and the risk the parties were facing.

Debtor contends that neither FENB nor Claimant ever suffered any loss from the failure to pay the taxes. And Mr. Idler goes on to explain at Paragraph 8:

As it turned out, however, that risk never materialized. The Debtor obtained and provided to FENB written assurances from the tax collector's office that the Real Property would not be included in the tax sales, and the tax collector still has not conducted or even scheduled a tax sale. FENB never paid off the taxes. FENB never advanced any money or paid property taxes to the County of San Diego through and including the date of this Declaration because FENB (and its assignee Mr. Richards or Cajon), have not been and are not in jeopardy of a sale impinging upon their equity.

ECF No. 193, pp. 4–5. This argument is unpersuasive. It is immaterial that FENB never paid anything and the property has not been lost to a tax sale. The court does not analyze reasonableness in retrospect. Rather, it examines all circumstances existing when the parties entered into the Settlement Agreement. And at that time, the parties believed there was a substantial risk of the property being sold.

At the April 27, 2016 hearing, Debtor argued that Mr. Idler's declaration is insufficient to show a reasonable relationship between the $6.8 million discount and the damages that would flow from Debtor's breach. Not so. Mr. Idler's declaratory testimony constitutes undisputed evidence.

In addition, the court finds that many of the reasonableness considerations set forth in the Law Revision Commission's comments to CC § 1671(b) are in Claimant's favor. First, the parties had relatively equal bargaining power when crafting and entering into the Settlement agreement. They are both sophisticated market players who closely negotiated the contract at arm's length. And they did so while represented by skilled attorneys. Indeed, § 20.0 of the Settlement Agreement specifically states "[e]ach of the parties hereto acknowledges the receipt of advice of legal counsel regarding this Agreement prior to executing it." The Settlement Agreement at p. 9. Further, this is not a form contract. Under these circumstances, the court respects the contract's sanctity and will not redraft it the way Debtor urges.

Based on the foregoing, the court concludes that requiring Debtor to pay the additional $6.8 million for failure to timely pay the delinquent property taxes was not a penalty under California law. But even if it were, it would not be unenforceable under CC § 1671. As to the forfeiture analysis, *Grand Prospect* states that if a conditional provision in a contract is an illegal penalty, then forfeiture automatically arises under CC § 3275. The provision in question is conditional, but it is not an illegal penalty. Therefore, forfeiture does not automatically obtain. And for the reasons for forth below, there is no forfeiture in this case.

The next question is whether requiring Debtor to pay the extra $6.8 million for failure to make the $8.5 million lump sum payment by March 1, 2016 is a penalty. Debtor concedes that it is in default of this obligation. But it urges the court to adopt the same analysis as the delinquent property tax default. The damage from this breach, it argues, is simply money at the current interest rate. And in any event, there is no way Debtor's failure to make this payment would cause Claimant $6.8 million in loss.

Claimant does not substantively address this argument—it focuses solely on the delinquent property taxes. For that reason, the court could theoretically sustain this portion of the claim objection. *See* Local Bankruptcy Rule 9013–7(b)(2) ("The Court may treat a failure to timely file opposition to a motion or application by any party in interest ... as the non-objecting party's consent to the granting of the

motion and waiver of oral argument."). In this instance, however, whether there is a penalty in this context is immaterial. The Settlement Agreement is structured so that *any* default by Debtor—the delinquent property taxes, the lump sum payment, etc.—would require it to pay the Total Indebtedness. And the court has already determined that requiring Debtor to make the payment for failure to pay the delinquent property taxes is not a penalty. Even if it were a penalty in the context of the missed lump sum payment, the outcome would not change—Debtor ·would still need to pay the Total Indebtedness.

· In its reply and at the April 27, 2016 hearing, Debtor urged the court to consider *Harbor Island*'s "one size fits all" analytic. There, the court noted that various defaults could have resulted in Harbor Island's entitlement to the $240,912 it claimed in deferred rent. And it could not fathom how some of these breaches—such as failure to provide copies of maintenance contracts—were reasonably related to the damages Harbor Island would suffer. For this reason, it did not see how the $240,912 could have represented a reasonable endeavor by the parties to estimate the fair average compensation for any loss Harbor Island would sustain. Debtor likewise argues that the Settlement Agreement calls out a variety of potential defaults—such as disposing of a barstool and not replacing it. And like *Harbor Island*, not every one of these breaches would have inflicted $6.8 million in damages. Therefore, the parties gave no consideration to all different types of defaults and the damages that might flow from them. The $6.8 million conditional discount was designed to compel performance, not compensate FENB for actual default damages. And for that reason, the provision is a penalty.

The court fails to see how a "one size fits all" prohibition avails Debtor. The court has already determined that the additional $6.8 million due for the Debtor's failure to timely pay the delinquent property taxes is not a penalty as a matter of law. It did so because it found a reasonable connection between the $6.8 million and the potential loss owing to the tax sale. It is true that any default, regardless of severity, would have resulted in Debtor owing the Total Indebtedness. But the court is not addressing any default under the Settlement Agreement; it is analyzing the failures to pay the taxes and the lump sum payment. It is not reaching the lump sum payment issue, and it finds a reasonable basis for between the missed tax payment and the anticipated actual damages. The contractual consequence of that one occurrence—the missed delinquent property tax payment—fits its size, and that is sufficient to uphold the questioned provision.

The *Harbor Island* court also noted that Harbor Island still had remedies if Kim breached the covenant to maintain and repair the premises. Indeed, "the lease enumerated certain remedies available on breach and provided as well that Harbor Island was entitled to pursue any other remedies permitted by law." *Harbor Island*, 107 Cal.App.4th at 796, 132 Cal. Rptr.2d 406. And Harbor Island did so by suing Kim and obtaining a judgment. Debtor likewise argues that Claimant had remedies for various hypothetical defaults notwithstanding the $6.8 million. Debtor cannot understand how the damages from the failure to pay the taxes just happen·to equal what would be owed upon any other type of default. Again, the court accepts that certain defaults under the Settlement Agreement would not have caused Claimant $6.8 million ·in damages. The examples Debtor sets forth in Part II of its reply are instructive. And unlike the lease at issue in *Harbor Island*, the Settlement Agreement does not explicitly provide Claimant with default remedies—though § 12.0 suggests

that it could bring legal action on an alleged dispute, breach, or default.

But the court need not decide what remedies Claimant hypothetically possessed for, say, Debtor's removing a bar stool. The relevant default here is the failure to pay the delinquent property taxes. And as stated above, the damages for that breach were not just the $1.7 million—it was the Total Indebtedness. Debtor contractually owed the Total Indebtedness the entire time. And these sophisticated market players agreed to reduce it to $8.5 million provided various conditions were satisfied. Without this protection, FENB theoretically would not have agreed to prospectively reduce the Total Indebtedness in the first place. Simply put, the additional $6.8 million for failure to timely pay the delinquent property taxes was in fact Claimant's remedy. And it is now entitled to that remedy for Debtor's failure to meet a condition precedent to a potential future debt reduction.

*Harbor Island* is also distinguishable. First, it involves a real property lease agreement, which the court finds a significant difference. At bar, by contrast, is a loan contract dispute. Second, the original lease obligation in *Harbor Island* was $30,974.40 per month. By extension, the parties agreed that it would be three times that amount—$96,364.80 per month—unless Kim satisfied all his obligations under the amended lease. There is no reasonable connection between those two numbers. But here, a direct relationship exists between the $6.8 million and the peril Claimant faced for Debtor's failure to pay the delinquent property taxes. In addition, the agreement in *Harbor Island* began at about $30,000, was increased, and then Harbor Island moved to collect. Here, the preexisting obligation—the Total Indebtedness—was initially larger and then reduced to $8.5 million.

Debtor's other authorities are factually and legally distinguishable. *Greentree* involved a confession of judgment. Execute failed to pay $45,000 for financial advisory services. The parties memorialized a stipulation for entry of judgment where Execute would pay Greentree less—$20,000 in two installments—provided the installments were timely. As every civil practitioner knows, confessions of judgment have historically been quite common. But Debtor and FENB did not create a stipulation for entry of judgment. Rather, the Settlement Agreement involves various conditions precedent.

*Purcell*'s facts are closer to those of the present case. As in *Greentree*, however, it involved a stipulated judgment (unlike here). In any event, the *Purcell* court analyzed the stipulation for judgment and found it did not pass muster under CC § 1671's requirements. But § 3.1.5, by contrast, does insofar as it requires Debtor to pay the Total Indebtedness for its failure to timely pay the delinquent property taxes.

*Holiday Inns* involved an option contract to purchase real property. The plaintiffs held a renewable option to buy land. That is not what the Settlement Agreement entails. The *Holiday Inns* plaintiffs had partially paid for something they expected to receive in the future, namely the durability of their option. In this case, Debtor contractually owes the Total Indebtedness. It is seeking to have that amount reduced. This is not a situation where it is paying for a benefit it is guaranteed to receive in the future like a continuing option. It is a benefit in the form of a potential future reduction of a liability that Debtor contractually admitted it was responsible for.

*Grand Prospect* stands for the general proposition that contractual provisions triggered by one or more conditions prece-

dent can be penalties and do not escape judicial scrutiny simply because they are drafted using conditional language. The court agrees, and has accordingly analyzed the Settlement Agreement. Section 3.1.5 is not an unenforceable penalty—at least not when it comes to Debtor's failure to timely pay the delinquent property taxes. As such, Debtor did not automatically incur forfeiture.

### Jade Fashion *Controls*

The court will adopt *Jade Fashion*'s reasoning because it is factually closest to the present case. Jade Fashion & Co., Inc. ("Jade Fashion") manufactured and sold garments to other businesses. In Spring 2010, it had a series of purchase orders with Harkham Industries, Inc. ("Harkham"). Harkham fell behind on its payment obligations in November 2011. At the time, it owed Jade Fashion $341,628.77 for goods purchased. The parties then agreed to a repayment plan with weekly $25,000 payments by Harkham for thirteen weeks. They also agreed that if Harkham made all payments timely it could take a $17,500 discount from the total amount owed, subtracted from the final installment payment. If Harkham failed to make any of the installments, though, it would not be entitled to the discount and the remaining balance due would be due immediately.

Harkham thus admitted the $341,628.77 total debt. And it timely made the first two weekly installments. After that, however, it was late on five installments. Two weeks before the final installment was due, Harkham made three separate payments. The final payment reflected the remaining balance less the $17,500 discount. Jade Fashion refused to accept the last payment, asserting that Harkham's failure to timely make all weekly payments deprived it of the discount.

Jade Fashion then filed suit for breach of contract and breach of guaranty. The complaint sought $56,628.77 in damages—the $17,500 discount plus the $39,128.77 uncashed final check. On summary judgment, Harkham argued that the $17,500 discount provision was an unenforceable penalty or forfeiture. The trial court granted Jade Fashion summary judgment, noting that the $17,500 at issue was part of the original $341,628.77 debt, and as such, was not an unlawful penalty or forfeiture. Harkham appealed.

On appeal, Harkham asserted that, like the default provisions in *Greentree* and *Purcell*, the $17,500 discount was an impermissible penalty because it bore no reasonable relationship to the damages that the late payment actually visited upon Jade Fashion. The Second District Court of Appeal distinguished *Greentree* and *Purcell*. In those cases, the parties agreed to settle a pending lawsuit for a stipulated amount less than the damages alleged in the complaint. If the defendant breached the settlement agreement, it would then be required to pay specified additional damages disproportionately higher than the settlement amount. In Jade Fashion's case, however, the parties' agreement was not one to settle or compromise a disputed claim; it was to forbear on the collection of a debt that was admittedly owed for delivered goods so long as timely installment payments were made.

Thus, the court concluded that the $17,500 discount was not liquidated damages for a breach of contract. Nor was it an additional payment over and above any debt owed. Rather, it was part of the $341,628.77 total indebtedness that Harkham admitted it owed in the agreement. Under these circumstances, CC § 1671 did not apply, and the discount provision's enforceability did not depend on whether it bore a reasonable relationship to the actual damages that the late payments occasioned. Because Harkham expressly

agreed to pay the entire balance and take the discount only if it timely paid each weekly installment, Jade Fashion suffered actual damages of $17,500 when Harkham did not pay on time.

In addition, unlike the stipulated judgments at issue in *Greentree* and *Purcell*, the agreement's plain language made clear that the parties did not compromise the original debt for a lesser amount subject to a penalty for late payment. Rather, they explicitly agreed that the amount owed was the original balance. The $17,500 discount would not be available until the condition precedent was satisfied.

Further, Harkham—like Debtor—relied on *Harbor Island* and argued that the discount provision was merely a penalty by another name. The court found this reliance misplaced. Again, the agreement at issue did not increase the original debt amount Harkham owed if any future payments were late. The $17,500 discount was part of the pre-existing debt that Harkham admitted. And while the court acknowledged *Harbor Island*'s holding that CC § 1671 cannot be circumvented by labeling a penalty a discount, the agreement at bar did not support a finding that Jade Fashion intended to penalize Harkham.

Finally, the court rejected Harkham's argument that the lost discount was an unlawful forfeiture under CC § 3275 because it was premised on the theory that the parties settled their dispute for less than the total amount due when they made the agreement. The actual damages Jade Fashion suffered were not limited to interest on the late payments. They also included the $17,500 portion of the debt Harkham owed yet refused to pay.

Like in *Jade Fashion*, the present case involves a debtor that contractually admitted owing the entire principal balance in a settlement agreement. In addition, the *Jade Fashion* parties agreed that the total indebtedness would remain due, but provided Harkham made all payments on time, it could take advantage of a $17,500 discount. This is precisely what happened under the Settlement Agreement. Debtor admitted the Total Indebtedness, and agreed that it would continue owing that amount until it met all conditions precedent. Only then could it take advantage of the $6.8 million discount.

The differences between *Jade Fashion* and the present situation are subtle. First, *Jade Fashion* involved a pre-litigation settlement agreement and repayment plan for an undisputed debt. Here, however, the Settlement Agreement was made to resolve hotly contested state court litigation. Second, the *Jade Fashion* parties structured the repayment schedule based on the total indebtedness, whereas here Debtor was to make interest-only payments based on the discounted $8.5 million.

Debtor's reply attempts to distinguish *Jade Fashion*, but neither distinction matters. *Jade Fashion* did not turn on these distinctions. The court found it important that, unlike in *Greentree* and *Purcell*, the parties settled for the full amount (*Greentree* and *Purcell* involved settlements for a stipulated amount less than the damages alleged in the complaint). In addition, there was not a disputed claim—the parties agreed that Harkham owed the full amount. It is no different here. The parties litigated vigorously, but in the end Debtor admitted to the Total Indebtedness in the Settlement Agreement. The Total Indebtedness is based on the Loan Agreement. As in *Jade Fashion*, the amount originally owed is not disputed. The Settlement Agreement constitutes an admission of the Total Indebtedness that gives Debtor an opportunity to reduce it in the future. The parties did not settle or compromise anything in that regard; the Total Indebtedness has always been what Debtor owed.

*Jade Fashion*'s holding was predicated on the $17,500 discount's being part of the main indebtedness that Harkham admitted. For that reason, the court found CC § 1671 inapplicable. Like in *Jade Fashion*, Debtor admits owing the Total Indebtedness. The $6.8 million discount is part of the Total Indebtedness. Under this logic, CC § 1671 is inapplicable to § 3.1.5 of the Settlement Agreement.

The *Jade Fashion* court also found it important that the parties did not compromise the original debt for a lesser amount subject to a late payment penalty. Instead, they agreed that the total indebtedness would remain due and owing subject to certain conditions precedent. The same happened here.

*Jade Fashion* did not turn on the fact that Harkham agreed to a repayment schedule based on the total indebtedness as opposed to the discounted payoff amount.

### The Alleged Forfeiture

■■■ CC § 3275 grants relief from forfeiture provided that a party: (1) through the terms of an obligation, incurs forfeiture or a loss in the nature of forfeiture due to its failure to comply with the obligation's provisions; and (2) makes full compensation to the non-breaching party. By the statute's plain terms, there must be a forfeiture to be relieved from. In this instance, Debtor fails to assert and prove facts entitling it to forfeiture relief.

Debtor must show that, by breaching the Settlement Agreement, it lost a right, privilege, or property, or otherwise forfeited something to FENB or Claimant. It cannot. When the parties signed the Settlement Agreement, they agreed that $15,379,362.49 was due and owing. This

has ever been Debtor's contractual liability—the parties simply worked in a conditional discount provision. At most, Debtor held a contingent right to a future debt reduction, subject to certain conditions precedent. But as explained above, it has failed to meet two of those conditions—and never can. And as the court stated in the Order, Debtor did not even have the contingent right to the discount on the petition date because, by failing to pay the delinquent property taxes, the contingency was not perfected prepetition.[2] Put differently, Debtor's conditional right to the discount never arose; it held a former contingent right that that expired prepetition. To that end, the court agrees with Claimant that Debtor never acquired rights or property to forfeit by not receiving the discount. It never held a perfected right to the discount, so it was not Debtor's to forfeit. On that basis, Debtor did not "lose" any entitlement to the discount—either by failing to pay the delinquent property taxes or missing the deadline to pay the $8.5 million lump sum. It never held such an entitlement.

■■■ Nor did Debtor forfeit its $5 million in litigation rights against FENB. The court fails to see how this is forfeiture at all. Section 5.0 of the Settlement Agreement—which requires Debtor to dismiss the State Court Action with prejudice—is separate and apart from any condition precedent found elsewhere in the agreement. It is part of the consideration Debtor paid to induce FENB to enter into the Settlement Agreement. Presumably, FENB would not have agreed to settle the dispute without this consideration—Debtor had to surrender this right in order to effectuate the Settlement Agreement. In any event, forfeiture involves a contractual

---

**2.** The court acknowledges that failure to make the $8.5 million lump sum payment was a post-petition event. But this does not change the analysis since both conditions needed to be met in order to take advantage of the discounted payoff.

provision requiring a party to give up a right under certain circumstances. Section 5.0 is not that type of provision.

For the foregoing reasons, the court: (1) holds that the additional $6.8 million for Debtor's failure to pay the delinquent property taxes is not a penalty, or alternatively, represents acceptable liquidated damages under California law; (2) declines to reach the issue of whether the additional $6.8 million for failure to make the lump sum payment would be a penalty; and (3) concludes that Debtor did not suffer forfeiture of the $6.8 million—by either failing to pay the delinquent property taxes or not making the lump sum payment—or of its $5 million in litigation rights against FENB.

*The "Materiality" Test Is Inapplicable*

Debtor also contends that bankruptcy cases apply a "materiality" test to breaches resulting in forfeiture. It argues that a breach must be substantial for it to be non-curable and result in property forfeiture. And under what appears to be equitable principles, Debtor asks the court to examine the particular facts and circumstances of this case—by balancing the respective benefits and harms to FENB, Claimant, Debtor, Debtor's investors, and other creditors—and conclude that its failure to timely pay the delinquent property taxes was neither material nor economically significant. Claimant does not substantially address the materiality argument in its opposition—other than asserting that the court already rejected it in the Order. Not so. The court held in the Order that: (1) Debtor's breach worked a default to a third party under the Settlement Agreement and prevented a·condition precedent from being satisfied; (2) as a matter of law, Debtor cannot use §§ 1123(a)(5)(G), 1124(2), and *Entz–White* to cure its defaults under the Settlement Agreement. It did not address whether Debtor's breach is

material or economically substantial. Nevertheless, the court declines to adopt Debtor's reasoning.

Debtor's various authorities on this issue are unpersuasive. To start, all the cases Debtor cites—with the exception of *Vanderpark Properties, Inc. v. Buchbinder (In re Windmill Farms)*, 841 F.2d 1467 (9th Cir. 1988)—are nonbinding on this court. Moreover, they are distinguishable.

*In re Chapin Revenue Cycle Management, LLC*, 343 B.R. 728 (Bankr. M.D. Fla. 2006) involved a debtor's motion for an order determining that a software license agreement was not an executory contract or, alternatively, for authority to assume that agreement. The debtor and BNX Company ("BNX") entered into an end-user license agreement for the debtor's installation and use of certain software BNX developed. And they appointed an individual to provide services for maintaining and programming the software for a monthly fee. After that person resigned, however, the debtor began interviewing replacement candidates. As part of the interview process, the debtor made available to the candidates portions of the software's source code. Debtor then sought to assume the license agreement. BNX opposed, stating that Debtor breached the license agreement by sending copies of the files to the candidates and allowing them remote access to the software. This, BNX contended, was a nonmonetary default and a historical event that could not be cured. The court first determined that the license was an executory contract that could normally—provided defaults are cured—be assumed under § 365(a). The court ultimately concluded that the debtor's default under the license agreement was not material and that BNX suffered no substantial economic detriment. As such, the debtor was not required to cure the default, and

was authorized to assume the license agreement.

In *Walden Ridge Development, LLC,* 292 B.R. 58 (Bankr. D.N.J. 2003), the debtor was created for the purpose of acquiring and developing a specific parcel of real property. And it entered into an agreement to purchase the property from Nicholas Rizzo t/a Edgewater Associates ("Rizzo"). But the debtor failed to obtain financing by the closing date and was denied additional time to do so. It instead filed for bankruptcy the date before the closing date.

Two days earlier, the debtor entered into an option agreement with another entity. Under its terms, the entity would pay the debtor $10,000 for an option to acquire the purchase contract for $820,000. The debtor intended to use the $830,000 to pay its unsecured creditors 100% of their scheduled claims. After denying a separate motion to dismiss and to vacate stay, the court analyzed whether the debtor could assume the option and assume and assign the purchase contract. It noted that the purchase contract is an executory contract under § 365 that could be assumed or rejected at any time before plan confirmation, subject to certain conditions. The court further explained that an executory contract could be assigned under § 365(f)(2) provided it is assumed under § 365. And § 108(b) does not apply to curing defaults in executory contracts because § 365 is the more specific provision.

In addition, the court acknowledged that certain historical facts are nonmonetary defaults that cannot be cured and are thus limited to § 108(b)'s 60–day extension provision. But it did not find that this exception applied to this particular circumstance, namely the debtor's failure to pay the purchase price and close under the time-of-the-essence letter. Indeed, the failure of a buyer to pay the purchase price

under an executory contract is a monetary default. And such a default is curable under § 365. The court further concluded that "where the default is non-monetary the debtor may be precluded from assuming an executory contract only if the default is material or if the default causes substantial economic detriment." *In re Walden Ridge Dev., LLC,* 292 B.R. 58, 67 (Bankr. D.N.J. 2003) (citing *In re Joshua Slocum Ltd.,* 922 F.2d 1081, 1092 (3d Cir. 1990)). The court granted the motion, finding that: (1) Rizzo would suffer no economic detriment if the closing occurred; and (2) the debtor was not limited by § 108(b)'s time limitation.

The court in *In re Vitzanza,* No. 98-19611DWS, 1998 WL 808629 (Bankr. E.D. Pa. Nov. 13, 1998) examined a debtor's motion to assume an unexpired non-residential lease agreement with 209–211 Chestnut Street Associates ("CSA") under § 365(a). CSA objected, arguing that: (1) the lease was terminated prepetition for both monetary and nonmonetary defaults and could not be redeemed under state law; (2) the debtor failed to cure or provide adequate assurance that he would promptly cure all defaults under the lease as required by § 365(b)(1)(A); and (3) the debtor failed to provide adequate assurance of future performance under the lease as required by § 365(b)(1)(C). The court concluded that none of the alleged non-monetary defaults terminated the lease. And since the lease did not terminate prepetition, the debtor was not barred from assuming it. It did, however, find that the debtor's use of a sidewalk café outside the leased premises was a default under the lease. And CSA contended that this was a historical fact that could not be cured under § 365(b)(1)(A).

The court declined to apply the historical fact theory to the default at issue. It noted that CSA failed to present evidence

that the debtor's use of the sidewalk affects its good will or caused it any economic harm. And relying primarily on *Joshua Slocum*, it noted that the court has "some latitude" in waiving strict enforcement of lease provisions in the assumption process. It also cited the Third Circuit's so-called "materiality" test: "the relevant factors in determining whether to exercise discretion and refuse to enforce a lease provision are the materiality of the default at issue and whether the default caused 'substantial economic detriment' to the landlord." *In re Vitanza*, 1998 WL 808629, at *25 (citing *Joshua Slocum*, 922 F.2d at 1092). And the court concluded that, under the facts and circumstances of the case, the debtor's failure to abide by the use restriction provision for the sidewalk was not a material default under the lease. Accordingly, it chose not to enforce the debtor's prior default of that clause. Although it ultimately allowed the debtor to assume the lease, the court did so on the condition that it provide adequate assurance of future performance given his prior monetary defaults.

In *Joshua Slocum*, the debtor signed a lease for a retail store in a shopping center. After filing bankruptcy, the Chapter 11 Trustee moved to assume and assign the lease, which contained a provision allowing the debtor or landlord to terminate the lease if, after six year, the debtor's average yearly sales were below a certain amount. The debtor opposed the motion, but the bankruptcy court allowed the assumption and assignment while excising the above provision. The Third Circuit determined that the shopping center fell under § 365(b)(3)'s heightened requirements, and the bankruptcy court had no authority to excise the average yearly sales provision. The court went on to note that, in the context of § 365, "the [bankruptcy] court does retain some discretion in determining that lease provisions ... may still be re-

fused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets." *In re Joshua Slocum*, 922 F.2d at 1092 (quoting *In re Mr. Grocer, Inc.*, 77 B.R. 349, 354 (Bankr. D.N.H. 1987)). But the bankruptcy court incorrectly concluded that the excised provision was not material or economically significant.

In *In re Lee West Enterprises, Inc.*, 179 B.R. 204 (Bankr. C.D. Cal. 1995), the Chapter 7 Trustee sought to assume and assign certain franchise agreements between the debtor and various entities. As part of the assumption motion, the Trustee proposed curing the defaults under the franchise agreements. Several franchisors opposed the motion because the debtor's default under the franchise agreements—closure of its dealership operations—was non-curable under § 365. In relevant part, the court analyzed whether the closure defaults under the franchise agreements were of "sufficient substance" and reflected the requisite "materiality and economic significance" under *Windmill Farms* and *Joshua Slocum*. Relying on the California Vehicle Code and the franchise agreements, the court concluded that the dealership's failure to maintain operations was material. The court thus held the default incurable, and denied the motion.

After reviewing the authorities above, the court rejects Debtor's materiality argument. These cases all involve the assumption or assignment of executory contracts, license agreements, purchase contracts, options, franchise agreements, or unexpired non-residential leases. And each court's analysis centers on §§ 365 or 108. None of these elements are at issue in this case.

*Windmill Farms*—Debtor's sole Ninth Circuit authority—is of no help, either. There, the bankruptcy court granted the Chapter 7 Trustee's motion to assume and assign the lessee's interest in a commercial property. The lessor opposed, claiming that the lease terminated prepetition under California law. In addition, it argued that the court erred in allowing assumption given the outstanding, uncured defaults. The Ninth Circuit found that the Trustee attempted to cure the monetary defaults and the lessor's refusal to accept payment could not prevent assumption of the lease. It further stated that "[a]s we read the record, the bankruptcy court found the alleged nonmonetary defaults were not of sufficient substance to preclude assumption of the lease. This finding is not clearly erroneous." *In re Windmill Farms, Inc.*, 841 F.2d at 1473. It thus concluded that the alleged monetary and nonmonetary defaults did not preclude the Trustee's assumption of the lease.

Like the nonbinding cases Debtor cites, *Windmill Farms* analyzed an assumption and assignment of a commercial lease under § 365. It did not specifically endorse a "materiality" test. Rather, it simply agreed with the bankruptcy court that nonmonetary defaults must be sufficiently substantial to preclude lease assumption. Again, this court is not confronted with an assumption of a lease or executory contract. And it is dubious that the Ninth Circuit has endorsed a materiality test in the present context.

■ By asking the court to balance the parties' respective harms and benefits, it appears that Debtor is advocating an amorphous power to do equity by disallowing the alleged forfeiture or penalty under bankruptcy principles. But *Law v. Siegel*, — U.S. —, 134 S.Ct. 1188, 1196–97, 188 L.Ed.2d 146 (2014) does not permit this. As the Supreme Court has put it:

We have long held that "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of" the Bankruptcy Code. *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988); see, *e.g., Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 24–25, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000); *United States v. Noland*, 517 U.S. 535, 543, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996); *SEC v. United States Realty & Improvement Co.*, 310 U.S. 434, 455, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940).

*Law*, 134 S.Ct. at 1194–95. That being said, Debtor cites no Code provision authorizing the court to: (1) examine the case's particular facts and circumstances; (2) weigh the equities; and (3) allow Debtor to fully cure its defaults and reinstate its obligations under the Settlement Agreement so that it may take advantage of the $8.5 million discounted payoff. The cases Debtor relies upon are all pre-*Siegel*.

For these reasons, the court declines to adopt a materiality test. It therefore **overrules** Debtor's objection that its failure to timely pay the delinquent property taxes— a default under the Settlement Agreement—should nonetheless be cured and reinstated given the lack of material harm or economic detriment to FENB or Claimant.

### FENB Did Not Breach the Settlement Agreement or the Loan Agreement

■ The parties have conflicting interpretations of the Settlement Agreement, the Loan Agreement, and how those documents interact. Debtor contends that § 8.1(c) of the Loan Agreement entitled it to 30 days' notice to cure its default and make the tax payment. And FENB allegedly violated this provision twice with the First Default Letter and the Second De-

fault Letter. Debtor therefore believes that it still has a right to cure its default and, alternatively, should not have to because FENB breached first. Claimant, for its part, asserts that the 30–day notice and right to cure directly conflicts with the Settlement Agreement's requirement that the delinquent property taxes be paid by March 23, 2014. And the Settlement Agreement contains no provision for a notice of default or right to cure. For the following reasons, the court agrees with Claimant's interpretation and concludes that FENB did not breach the Settlement Agreement, the Loan Agreement, or any underlying loan document.

The court begins by analyzing the Settlement Agreement and the Loan Agreement's language. Section 14.0 of the Settlement Agreement provides:

> This Agreement constitutes the entire Agreement between the Parties pertaining to the subject matter described herein, and supersedes all prior and contemporaneous agreements, representations, and understandings of the Parties. No supplement, modification, or amendment to this Agreement shall be binding unless executed in writing by all the Parties.

The Settlement Agreement at p. 8. Section 9.15 of the Loan Agreement likewise states:

> This Agreement, together with the other Loan Documents, represents the entire agreement among Borrower, Guarantor and Lender and supersedes all prior agreements among the parties with respect to the Loan. This Agreement and the other Loan Documents may only be modified by written instrument executed by the applicable parties.

The Loan Agreement at p. 44.

These merger clauses mean that the parties intended both documents to be a complete and final expression of their intent. Because both contracts are fully integrated writings, the court need not—indeed should not—consider extrinsic evidence unless there are ambiguous terms. Here, however, the court finds that both documents are plain and unambiguous. It thus limits its analysis to their clear and explicit language, *i.e.*, the four corners of each agreement. In doing so, the court concludes that neither the Settlement Agreement nor the Loan Agreement is susceptible of Debtor's interpretation.

### The Settlement Agreement

Section 3.0 of the Settlement Agreement sets forth the latter's terms and conditions. Section 3.1 unambiguously states that Debtor shall pay the $8.5 million lump sum by March 1, 2016. But during the time between the Settlement Agreement's execution (December 23, 2014) and the payment date (March 1, 2016), Debtor or Mr. Gamboa had to satisfy other conditions.

In relevant part, § 3.1.1 provides that Debtor or Mr. Gamboa shall pay all amounts necessary to bring current all past due real property taxes—estimated at $1.7 million—by the later of either December 31, 2013 or within 90 days of the Settlement Agreement's execution (March 23, 2014).

Section 3.1.1.2 gives FENB the option—but not the mandate—to advance funds necessary to cancel a tax sale should Debtor fail to pay delinquent property taxes.

Section 3.1.5 unambiguously states that the amount due and owing shall remain at the Total Indebtedness until Debtor makes the $8.5 million lump sum payment. In addition, "[u]pon payment of the Lump Sum Payment, and so long as there has been no other Event of Default under this Agreement, Lender shall waive the difference remaining between the Lump Sum Payment and the Total Indebtedness." The Settlement Agreement at p. 5.

Section 4.0 defines various events of default. Section 4.0(a) defines an event of default as "[f]ailure to timely perform any of the obligations and/or conditions (including, but not limited to, the payment obligations) set forth in this Agreement or the New Security Agreement." *Id.* at p. 6. Section 4.0(b) describes another event of default as "[e]xcept as revised by this Agreement, failure to timely perform any of the obligations and/or conditions set forth in the Note, Loan Agreement, Deed of Trust or Security Agreement." *Id.* As the parties correctly assert, the Settlement Agreement neither allows nor prohibits remedying a default. It does not require that a notice of default or right to cure be given.

Most important, § 3.5 provides that "[e]xcept as revised by the terms and conditions set forth above, all other terms and conditions of the Note, Loan Agreement, Deed of Trust, Security Agreement and New Security Agreement shall remain in full force and effect." The Settlement Agreement at p. 6. The court interprets this provision to mean that the underlying loan documents—including the Loan Agreement—remain in full force and effect except to the extent the Settlement Agreement supersedes them in §§ 1.0 through 3.4. Debtor, FENB, and Claimant are all bound to the Settlement Agreement by virtue of § 11.0.

That being said, Debtor has now breached the Settlement Agreement in two ways. First, it did not pay the delinquent property taxes by the March 23, 2014 deadline. Second, it failed to make the $8.5 million lump sum payment by March 1, 2016. Both breaches have worked a default under § 4.0(a). As the court stated in the Order, Debtor's breaches have two consequences: (1) it puts Debtor in default under § 4.0; and (2) it prevents a condition precedent from being satisfied. As such, Claimant'

duty to waive the balance greater than the $8.5 million lump sum payment has never been triggered. And Debtor's right to the debt reduction has not arisen.

If this were the end of the analysis, the court might agree with Debtor that it could cure the above defaults since the Settlement Agreement is silent on the issue. But the court must also examine how the Loan Agreement interacts with the Settlement Agreement.

### The Loan Agreement

Article V consists of Debtor's representation and warranties, which it claimed were true on the Loan Agreement's execution date. Debtor further promised that they would remain true throughout the loan's term. Section 5.10 states, in relevant part, that "there are no unpaid or outstanding real estate or other taxes or assessments on or against the Project or any part thereof, except general real estate taxes for fiscal year 2007–2008 not yet due or payable." The Loan Agreement at p. 30.

Article VI addresses the parties' affirmative covenants. Section 6.11 speaks to compliance with laws and contractual obligations. And it states, in relevant part, that:

> Borrower will comply with and will cause Manager to comply with (i) the requirements of all applicable laws, rules, regulations and orders of any governmental authority (including, without limitation, laws, rules, regulations and orders relating to taxes, employer and employee contributions, securities, employee retirement and welfare benefits, environmental protection matters and employee health and safety) as are now in effect and which may be imposed upon Borrower or Manager or the maintenance, use or operation of the Project
> . . . .

The Loan Agreement at p. 35.

Finally, Article VIII treats events of default. Section 8.1 lists twelve of them.

Only the first three merit discussion. Section 8.1(a) considers it an event of default if Debtor fails to pay when due either: (1) the principal balance of the loan; or (2) within five days of the due date, "any of the other payment or deposit obligations of Borrower to Lender ...." The Loan Agreement at p. 39. Section 8.1(b) provides that it is an event of default if Debtor fails to strictly comply with §§ 5.17, 6.1 and 5.3. Finally, § 8.1(c) states that it is an event of default to breach any covenant other than those described in subsections (a) and (b), "which is not cured within thirty (30) days after written notice ...." *Id.*

Taken together, it is apparent that Debtor had a duty under § 6.11 to comply with all tax laws—including paying taxes on time. But failing to pay taxes—a non-monetary breach as to a third party—does not fall under §§ 8.1(a) or (b). It might appear, then, that FENB needed to provide 30 days' written notice of the tax default under subsection (c) and allow Debtor an opportunity to cure. Not so.

Debtor fails to realize that § 3.5 of the Settlement Agreement specifically modifies and supersedes the tax-related provisions in the Loan Agreement. The Settlement Agreement requires that the delinquent property taxes be paid by March 23, 2014, and that Debtor or Mr. Gamboa keep the taxes current thereafter. The Settlement Agreement therefore controls here. And it does not require that a notice of default be sent. Nor does it give Debtor the right to cure. The 30-day written notice requirement in the Loan Agreement is inconsistent with the Settlement Agreement. FENB did not breach the Settlement Agreement or the Loan Agreement by declaring a default in the First Default Letter and the Second Default Letter. Nor did it breach by failing to give Debtor a right to cure.

### FENB's Alleged Breaches in Connection with Proposed MVP Funding

■ In the First Claim Objection, Debtor argued at length that FENB's failure to timely consent to subordinate financing constituted: (1) a breach of § 16.0 of the Settlement Agreement; (2) a violation of the implied consent to financing; (3) fraud; and (4) a violation of the implied covenant of good faith and fair dealing. At the parties' behest, the court deferred ruling on this issue. And Debtor did not renew it in the present claim objection. For the sake of analytical completeness, however, the court will now address it.

The court finds this argument unavailing. To start, according to Debtor it began making arrangements for subordinate financing in early January 2014. And Mr. Idler first sought FENB's approval of that funding in late December 2013 or early January 2014. He apparently made several demands, to no response. Then on March 25, 2014—two days after the deadline to pay the property taxes—Debtor received the Loan Commitment from MVP that imposed its own conditions precedent.

As stated above, § 6.16 of the Loan Agreement provides that, if Debtor becomes obligated on any subordinated indebtedness, it: (1) shall enter into a subordination agreement "in form and substance satisfactory to Lender;" and (2) Debtor could not, directly or indirectly, "make any payment of principal, interest, or other obligations with respect to any subordinated loan ...." The Loan Agreement at p. 37. In addition, § 7.2(b) states that FENB's written consent is not required for subordinated loans that comply with § 6.16 and do not exceed $1.5 million.

The court does not see how FENB breached any of its obligations regarding its duty to approve subordinate lending, including the implied covenant of good faith and fair dealing. *See, e.g., Archdale v.*

*Am. Int'l Specialty Lines Ins. Co.*, 154 Cal.App.4th 449, 463, 64 Cal.Rptr.3d 632 (2007) ("In every contract ... there is an implied covenant of good faith and fair dealing that neither party will do anything which will injure the right of the other to receive the benefits of the agreement."). The fatal flaw in Debtor's argument is that it did not secure subordinate financing until after it had already missed the deadline to do so. While it may be true that it sought FENB's approval several times before the deadline, the evidence shows that there was no agreement for FENB to approve at any time before March 23, 2014. Section 6.16 explicitly requires that there be a subordination *agreement* in place. Under normal circumstances, Debtor would be correct that FENB's failure to consent to subordinate lending violated § 16.0 of the Settlement Agreement. But again, this was impossible because Debtor did not have an agreement in place until March 25, 2014. Accordingly, the court concludes that FENB's conduct did not excuse Debtor from meeting the March 23, 2014 tax payment deadline.

Further, the court agrees with Claimant that FENB was not obligated to approve subordinate lending because the Loan Commitment did not conform to §§ 6.16 and 7.2(b)—it required that Debtor make monthly interest payments. Simply put, it was never possible for Debtor to close on the Loan Commitment without violating the Loan Agreement. And FENB had no obligation to agree to a material change in the Loan Agreement.

Perhaps the result would be different if the evidence showed that: (1) Debtor received the Loan Commitment and submitted it to FENB for approval ahead of the deadline; and (2) FENB made it impossible or was otherwise responsible for Debtor missing the deadline. But this is not what happened. *See, e.g., Hale v. Sharp*

*Healthcare*, 183 Cal.App.4th 1373, 1387, 108 Cal.Rptr.3d 669 (2010) ("Prevention of performance by one party to a contract excuses performance by the other party."); *Lewis Pub. Co. v. Henderson*, 103 Cal.App. 425, 284 P. 713 (1930) ("It is elementary that one party to a contract cannot compel another to perform while he himself is in default.").

For these reasons, Debtor's objections regarding FENB's alleged breaches are **overruled.**

*Claimant Has Made a Prima Facie Showing That It Owns the Note and Trust Deed*

█ Debtor also suggests that Claimant lacks standing owing to conflicting paperwork it has filed in this case and the pending state court action against Mr. Gamboa. This argument is not well taken. To start, it is questionable whether Debtor simply pointing to inconsistent paperwork is sufficient to rebut the presumption of validity. The court need not decide that issue because, even it were sufficient, Claimant has proven the Claim's validity by a preponderance of the evidence.

Attached to the Claim is FENB's February 2015 endorsement and note assignment to Claimant. The Claim further shows that FENB assigned the trust deed to Claimant on February 10, 2015. And Claimant recorded that assignment on February 24, 2015. Claimant concedes that it filed inconsistent documents in the state court. But it provides evidence that this was promptly corrected with a February 22, 2016 notice of errata (ECF No. 208, pp. 29–37) (the "Notice of Errata"). The Notice of Errata establishes that: (1) FENB assigned its interest in the loan and loan documents to Claimant on February 23, 2015; and (2) FENB endorsed and assigned the note to Claimant on February 23, 2015. While it is true that the Claim includes a February 10, 2015 assignment,

the later assignment demonstrates Claimant's ownership. The court accepts that this was merely an error on Claimant's part. The current record is otherwise insufficient to conclude that Claimant does not own the note.

In any event, this argument holds no strategic value for Debtor. The court is sensitive to the potential constitutional standing issue. But as it explained at the April 27, 2016 hearing, this is a sterile and fruitless fight. Even if Claimant did not own the note and trust deed, nothing is stopping FENB from simply assigning those documents to Claimant even now.

Accordingly, Debtor's objection regarding the note and trust deed's ownership is consequently **overruled**.

### The Difference Between the Amounts Stated in the Claim and the Settlement Agreement

██ Finally, Debtor renews its prior argument that Claimant has not explained the difference between the Claim amount ($16,428,631.60) and the Total Indebtedness ($15,379,362.49)—a $1,049,269.11 difference. Debtor believes those figures should be either $9,307,500 (if it is entitled to the $6.8 million discount) or $15,379,362.49 (if it is not). Last time, the court overruled this objection without prejudice to Debtor's bringing forth evidence of the amount owed or the $120,000 allegedly paid to Claimant in 2015. Debtor believes it has now done so through Mr. Idler's declaratory testimony. Not so.

██ As the court has previously stated, a claim objection cannot simply assert a lack of documentation or substantiation; it must dispute the liability or amount of the claim. *In re Campbell*, 336 B.R. 430, 434–35 (9th Cir. BAP 2005). And the objector bears the initial burden of rebutting the presumption of validity and produce "sufficient evidence and 'show

facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves.'" *Lundell v. Anchor Constr. Specialists, Inc.*, 223 F.3d 1035, 1039 (9th Cir. 2000) (quoting *Wright v. Holm (In re Holm)*, 931 F.2d 620, 623 (9th Cir. 1991)). *See In re Placide*, 459 B.R. 64, 72 (9th Cir. BAP 2011). Only then does the burden shift to the claimant to prove the claim's validity by a preponderance of the evidence. *Lundell*, 223 F.3d at 1039.

In this instance, Debtor offers no new basis or evidence for its argument—aside from Mr. Idler's bare assertions. It fails to meet its initial burden of rebutting the Claim's presumptive validity. But even if it did, the burden would then shift to Claimant to prove the Claim's validity by a preponderance of the evidence. And even though, under the present circumstances, Claimant had no obligation to do so, it does provide such evidence. It points to an April 1, 2016 loan statement showing an outstanding balance of $17,578,112.74. This amount includes $120,000 in total payments Debtor made on June 10, 2015, June 19, 2015, and July 22, 2015. And Claimant explains where these numbers come from. Debtor does not dispute this amount, other than suggesting that discovery may yet uncover unidentified "additional charges." The court concludes that Debtor's argument regarding its liability on the loan is, on the current record, insufficient to rebut the Claim's presumptive validity.

Accordingly, Debtor's objection that the Claim is overstated is **overruled without prejudice** to Debtor renewing it with sufficient evidence of additional charges that Claimant allegedly fails to explain.

### Conclusion

Based on the foregoing, the court: (1) **overrules** without prejudice Debtor's objection that the Claim is overstated; and

(2) **overrules** the remainder of the claim objection.

IT IS SO ORDERED.